2012 CO 50

ACCIDENT AND INJURY MEDICAL SPECIALISTS, P.C.; Elite Chiropractic Care, Inc.; Physical Therapy, Inc.; Myocare, Inc.; A Shi Acupuncture, Inc.; Comprehensive Diagnostic Services, Inc.; Mile High Medical Group, L.L.C.; and Global Physician Services, P.C., Petitioners

v.

David J. MINTZ, Respondent.

No. 11SC210.

Supreme Court of Colorado, En Banc.

June 25, 2012.

Peters Mair Wilcox, Ronald L. Wilcox, Todd E. Mair, Denver, Colorado, Attorneys for Petitioners.

Springer and Steinberg, P.C., Jeffrey A. Springer, Michael P. Zwiebel, Denver, Colorado, Attorneys for Respondent.

Colorado Bar Association, David L. Masters, Fennemore Craig, P.C., Troy R. Rackham, White and Steele, P.C., John M. Lebsack, Denver, Colorado, Montgomery Little & Soran, P.C., David C. Little, Greenwood Village, Colorado, Attorneys for Amicus Curiae Colorado Bar Association.

Ogborn, Summerlin & Ogborn LLC, Thomas D. Neville, Denver, Colorado, Attorneys for Amicus Curiae Colorado Trial Lawyers Association.

Justice HOBBS delivered the Opinion of the Court.

¶ 1 We granted certiorari in *Mintz v. Accident & Injury Medical Specialists, PC*, —— P.3d ——, 2010 WL 4492222 (Colo.App.2010) (selected for official publication) to determine, "Whether an attorney owes fiduciary duties to third parties who are entitled to funds from Colorado Lawyer Trust Account Foundation (COLTAF) trust accounts." The court of appeals reversed a judgment of the trial court and held that an attorney did not owe fiduciary duties to a group of medical service providers [1] who were owed funds held in the attorney's COLTAF account.

¶ 2 The Providers and the attorney, David J. Mintz, had an extensive and often contentious personal and business relationship over several years. Typically, Mintz would refer an uninsured victim of a motor vehicle accident to the Providers for medical services, paying himself and his clients' medical costs out of proceeds he secured after negotiating insurance settlements for the clients. The relationship turned sour due to a dispute about costs of a joint advertising arrangement, and, for reasons disputed by the parties, Mintz began withholding funds owed to the Providers for his clients' medical costs. Mintz eventually initiated an interpleader action for the withheld funds, naming as defendants his clients and the Providers. The Providers answered with several counterclaims, including breach of fiduciary duty.

---

1. We refer to the group of the medical providers in this action as the "Providers." They are Accident and Injury Medical Specialists, P.C.; Nadler, Inc.; Elite Chiropractic Care, Inc.; Physical Therapy, Inc.; Myocare, Inc.; A Shi Acupuncture, Inc.; Comprehensive Diagnostic Services, Inc.; Mile High Medical Group, LLC; and Global Physician Services, P.C. These medical providers were the defendants in the original interpleader action filed by attorney David J. Mintz.

¶ 3 The trial court bifurcated the action and first determined that the Providers were entitled to the specific amount withheld in Mintz's COLTAF account but no more. In the second trial, the trial court found for the Providers on their abuse of process and breach of fiduciary duty counterclaims. The court of appeals reversed the trial court's holdings for the Providers in the second trial.

¶ 4 We agree with the court of appeals and affirm its judgment. We hold that the Providers may not maintain a breach of fiduciary duty tort action against Mintz based on his obligations as trustee of his COLTAF account. The attorney-client relationship creates fiduciary obligations with corresponding liabilities on the part of the attorney to the client, not to third parties such as the medical providers in this case. Although Mintz may have had ethical or contractual obligations to disburse money that clients owed to the Providers out of insurance settlement proceeds placed into his COLTAF account, Mintz did not owe the Providers the duties of a fiduciary that give rise to tort liability.

## I.

¶ 5 This case concerns settlement proceeds recovered by personal injury attorney David J. Mintz on behalf of thirty-seven motor vehicle accident victims without health insurance. After these clients contacted Mintz for help recovering for their injuries, he referred them to the Providers. There, his clients' injuries were treated by one or more medical service entities located under one roof and primarily owned by a medical management company controlled by two individuals.[2] Although the details are disputed, Mintz and the Providers had a pre-existing arrangement whereby the Providers would pay Mintz a fee, Mintz would use the money to buy advertising space for his law firm in a publication owned by his wife called *The Lawyer Connection,* and he would refer injured clients who called the listed phone number, 1–800–4INJURY, to the Providers' medical offices for treatment.

¶ 6 The Providers often treated Mintz's clients on a lien basis. The client and Mintz would sign a "doctor's lien" form, granting the Providers a lien against any insurance settlement that Mintz would recover for the client. The dispute in this case concerns money owed to the Providers by clients treated under such a lien arrangement.

¶ 7 One of the disputes between the parties began in 2003. At the eventual trial, Mintz asserted that the Providers had not paid him enough under the advertising agreement. The Providers asserted that Mintz demanded extra referral fees for clients he referred to the Providers outside of *The Lawyer Connection* advertising. The Providers eventually paid Mintz $41,000 to resolve the issue. However, according to the Providers, Mintz continued to demand additional fees for referrals. According to Mintz, the $41,000 only covered past overdue fees and the Providers owed additional amounts for ongoing advertising.

¶ 8 Despite this dispute, the two parties continued to work together for mutual benefit: the joint marketing arrangement was revised and renewed, Mintz continued to send clients to the Providers for treatment, and the parties jointly purchased a building to house both Mintz's law office and the various medical provider offices.

¶ 9 Mintz began withholding a portion of his clients' settlement proceeds from the Providers in 2003. From 2003 to 2004, Mintz continued to negotiate with insurance compa-

---

2. An entity called Colorado Health Partners first managed the group of medical providers. The idea, according to the management company's owners, was to provide various medical services under one roof, including alternative treatments like chiropractic services, physical therapy, massage, and acupuncture. The managing entity oversaw logistical and business support for the individual entities, such as payroll, staffing, utilities, and leases.

Colorado Health Partners was dissolved and replaced in 2002 by a management group called Spine and Injury Centers. Two years later, Spine and Injury Centers dissolved for various reasons, one of which was financial difficulties from waiting more than a year for client payment of services from legal settlements. The two individuals (one medical doctor and one physical therapist) who owned Spine and Injury Centers jointly and various medical service entities individually, split over a disagreement. One formed Mile High Medical Group to manage the various medical entities under the same model.

nies on behalf of his clients, using his clients' medical bills as documented costs of treatment. However, after settling with insurance companies and receiving authorization from his clients to pay the clients' medical bills, Mintz retained the money in his COLTAF account.[3] According to Mintz, he had concerns about the Providers' billing practices and thought his clients may be getting "scammed." After he informed the clients that he was investigating the Providers, many clients approved his continued withholding of funds. Some, however, did not. One filed a disciplinary action against him.[4] According to the Providers, Mintz withheld funds because he wanted more money for referrals, and the billing dispute was a pretext to avoid liability.

¶ 10 Mintz eventually hired a lawyer to represent the clients and filed an interpleader action with the Jefferson County District Court in 2005, placing $130,186.79 into the registry of the court. The total was the amount withheld from the Providers by Mintz in his COLTAF accounts under his clients' names. Mintz named as defendants the clients and the nine Providers and asserted that he was concerned about the potential for conflicting claims to the money. He alleged in his complaint that the liens were unenforceable, the Providers had overcharged clients for treatments, and the Providers had engaged in unnecessary and excessive treatments.

¶ 11 In response, the Providers asserted crossclaims against the thirty-seven clients for failing to pay medical bills and counterclaims against Mintz, alleging that Mintz acted as a fiduciary of the Providers with respect to the funds held in his COLTAF account and breached his fiduciary duties by withholding the money.

¶ 12 The trial court bifurcated the case. After the first bench trial, in late 2007, the court found serious improprieties on both sides. The court found that the lien forms guaranteeing the Providers a share of settlement proceeds were invalid and unenforceable,[5] but determined the Providers were owed the interpled $130,186.79 as quantum meruit for medical services provided to the clients. However, the court refused to award the Providers amounts they claimed and billed above the $130,186.79 "based on the fact that ... there is some serious doubt about the accuracy of the amounts that [were] billed." The interpled funds were ordered disbursed to the Providers' law firm from Mintz's COLTAF account.

¶ 13 The second bench trial was held in early 2008 on the Providers' counterclaims against Mintz. The court heard conflicting testimony from various parties concerning the ongoing and often contentious relationship between Mintz and the Providers. In the trial court judge's May 30, 2008 bench ruling, the judge noted that "[t]here's so

3. A lawyer may create a COLTAF (Colorado Lawyer Trust Account Foundation) account to comply with the lawyer's duty to maintain the funds of clients and third parties in an interest-bearing account. *See* Colo. RPC 1.15.

4. In *People v. Mintz*, No. 05PDJ051, 2005 WL 1428535, (Colo. PDJ 2005), the Colorado Office of the Presiding Disciplinary Judge suspended Mintz from the practice of law for ninety days, in part for failing to inform his client of a delay in paying a provider, a violation of Colo. RPC 1.4(a) (failure to keep client reasonably informed).

5. The lien forms were titled "DOCTOR'S LIEN." One form signed by a client stated:

I hereby authorize and direct my attorney to pay directly to Accident and Injury Medical Specialists PC such sums as may be due and owing for medical services rendered to me both by reason of this incident and by reason of any other bills that are due these offices. I

further authorize my attorney to withhold upon receipt and place in a trust account such sums as may be due and owing to Accident and Injury Medical Specialists PC until which time a satisfactory payment amount has been determined and agreed upon by Accident and Injury Medical Specialists PC....

The carbon copy form contained six sheets, with the client's signature and address transferred from the first sheet onto the five underlying sheets. However, the underlying sheets replaced the name of the medical provider wherever it was mentioned, i.e., the term "Accident and Injury Medical Specialists PC" in the example above was replaced with a different Provider name on each sheet. Clients who testified at trial stated they were unaware that they had granted a lien to each of the Providers. The court found that the clients "did not have a meaningful understanding of what they were signing" because of this and other improprieties and misrepresentations by both Mintz and the Providers.

many lies and deceits that occurred in this case that I just have to put that on the record." The judge described the parties as having a "really toxic, toxic relationship."

¶ 14 The trial court found for the Providers on their abuse of process and breach of fiduciary duties counterclaims, and for Mintz on the Providers' tortious interference with contract and civil conspiracy counterclaims. On the abuse of process counterclaim, the trial court found that Mintz (1) used the interpleader process for the personal goal of avoiding further liability to Attorney Regulation Council, (2) "manufactured" the dispute over billing to provide justification for the interpleader, and (3) caused $284,050.09 in economic losses to the Providers, which represented the Providers' attorney fees spent in the course of defending the Providers' claims to the money. However, the trial court also found that "[t]here were problems with billing. There were problems with re-billing; there were problems with over billing."

¶ 15 On the breach of fiduciary duties counterclaim, the trial court found that Mintz acted as a trustee with respect to the funds in his COLTAF account owed to the Providers. Because Mintz failed to disburse the money after the clients authorized disbursement, effectively "advocating for one set of beneficiaries against another," the trial court found, Mintz breached the fiduciary obligations he owed to the Providers. The court awarded as damages $284,050.09, an amount duplicative of the abuse of process counterclaim award. The trial court also awarded the Providers $1,000 in punitive damages for a willful and wanton breach of fiduciary duties.

¶ 16 Upon Mintz's appeal of the judgments for the Providers, the court of appeals reversed the trial court and found that the record did not support either the abuse of process or breach of fiduciary duty rulings. *Mintz,* —— P.3d at ——, ——. The court of appeals held that Mintz did not abuse the interpleader process because the trial court had found in the first trial "serious doubt" about the accuracy of the Providers' bills. *Id.* at ——. Thus, the court of appeals held, the record did not support the court's finding

that Mintz "manufactured" the billing dispute. *Id.* at —— – ——.

¶ 17 The court of appeals also reversed the trial court's ruling on the breach of fiduciary duty counterclaim, finding that the record did not show that Mintz undertook a duty to act primarily for the best interests of the Providers. *Id.* at ——. The court noted that the funds were received for the benefit of Mintz's clients, not for the benefit of the Providers. *Id.* The court of appeals concluded that Mintz and the Providers were not fiduciaries but engaged in arm's length business transactions. *Id.*

¶ 18 We granted certiorari review of the court of appeals' holding that Mintz did not owe the Providers fiduciary duties with respect to the withheld funds in his COLTAF account. We affirm the judgment of the court of appeals.

## II.

¶ 19 We agree with the court of appeals and affirm its judgment. We hold that the Providers may not maintain a breach of fiduciary duty tort action against Mintz based on his obligations as trustee of his COLTAF account. The attorney-client relationship creates fiduciary obligations with corresponding liabilities on the part of the attorney to the client, not to third parties such as the medical providers in this case. Although Mintz may have had ethical or contractual obligations to disburse money the clients owed to the Providers out of insurance settlement proceeds placed into his COLTAF account, Mintz did not owe the Providers the duties of a fiduciary that give rise to tort liability. Accordingly, we affirm the court of appeals' judgment.

### A.

### Standard of Review

¶ 20 Whether one party owes fiduciary duties to another is a mixed question of law and fact. *See Vigil v. Franklin,* 103 P.3d 322, 325 (Colo.2004); *Moses v. Diocese of Colo.,* 863 P.2d 310, 321–22 (Colo.1993); *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 518 (Colo.1986). We

defer to the trial court's factual findings if they have support in the record. *Moses*, 863 P.2d at 322. We review legal determinations relevant to the existence of a fiduciary relationship de novo. *Paine, Webber, Jackson & Curtis*, 718 P.2d at 518 (examining factual findings to determine whether the evidence "established as a matter of law that the defendants had fiduciary duties" to the plaintiffs).

## B.

### Applicable Law

▪ ¶ 21 The breach of fiduciary duty cause of action is a tort to remedy economic harm suffered by one party due to a breach of duties owed in a fiduciary relationship. See *Town of Alma v. Azco Constr., Inc.*, 10 P.3d 1256, 1263 (Colo.2000); Restatement (Second) of Torts § 874 (1979). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Moses*, 863 P.2d at 321 (quoting Restatement (Second) of Torts § 874 cmt. a (1979)).

¶ 22 We recognize some fiduciary relationships as a matter of law, *e.g., In re Sather*, 3 P.3d 403, 409 (Colo.2000) (attorney-client); *Wright v. Wright*, 182 Colo. 425, 428, 514 P.2d 73, 75 (1973) (trustee-trust beneficiary), and recognize others based on the particular circumstances of the relationship between the parties, *e.g., Brodeur v. Amer. Home Assurance Co.*, 169 P.3d 139, 151 (Colo.2007) (where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest); *Paine, Webber, Jackson & Curtis*, 718 P.2d at 517–18 (where one party had extensive influence and control over the other's interests); *see also* 9 Stuart M. Speiser et al., *The American Law of Torts* § 32:81 (1992) (fiduciary relation may arise where "one of the parties reposes special trust and confidence in the other who is in a position to have and exercise influence over" the dependent party).

▪ ¶ 23 A fiduciary relationship imposes on one party a duty of care that supports a tort action independent of any contractual action. *Town of Alma*, 10 P.3d at 1263. Independent legal duties of care owed by a fiduciary include a duty to act with utmost loyalty on behalf of, and for the benefit of, the other party. *Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1289 (Colo.1996); *see also* Restatement (Second) of Torts § 874 cmts. a, b (1979) (fiduciary is under duty "to act for or to give advice for" another).

¶ 24 Fiduciary relationships that derive from a special relationship of trust, reliance, influence, and control are distinguishable from business relationships involving parties dealing at arm's length for mutual benefits. *See Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir.1991) ("[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties."); 37 C.J.S. Fraud § 11 (2008) ("Most business relationships or contractual relationships ... do not by themselves create fiduciary obligations, and fiduciary obligations should be extended reluctantly to commercial or business transactions.").

▪ ¶ 25 The attorney-client relationship is distinctly a fiduciary relationship arising as a matter of law and founded upon a special trust and confidence. *Olsen & Brown v. City of Englewood*, 889 P.2d 673, 675 (Colo.1995). To promote such trust and confidence, attorneys are governed by rules of conduct overseen by this court. *Id.* This system of attorney regulation and enforcement distinguishes the attorney-client relationship from other business relationships. *Id.* at 675–76.

▪ ¶ 26 Because a lawyer's loyalty is to his client, a lawyer does not owe fiduciary duties to non-client third parties. *See Allen v. Steele*, 252 P.3d 476, 482 (Colo.2011). In past cases, we have refused to extend an attorney's tort liability to non-clients for various reasons, including the adversarial nature of litigation and a concern that an attorney could be liable to an unforeseeable and unlimited number of third parties. *See id.* at 482, 485; *Mehaffy, Rider, Windholz & Wilson v. Central Bank Denver, N.A.*, 892 P.2d 230, 235 (Colo.1995); *see also Glover v. Southard*, 894 P.2d 21, 23 (Colo.App.1994) (attorney liability to third parties is strictly

limited for three policy reasons: "the protection of the attorney's duty of loyalty to and effective advocacy for his or her client; the nature of the potential for adversarial relationships between the attorney and third parties; and the attorney's potential for unlimited liability if his duty of care is extended to third parties").

¶ 27 Within the context of the attorney regulation system, Colo. RPC 1.15(a) requires a lawyer to hold funds of others received in connection with the lawyer's representation of a client in an interest-bearing trust account separate from the lawyer's own property. *In re Sather*, 3 P.3d at 409; Colo. RPC 1.15(a); Colo. RPC 1.15 cmt. 1. A primary purpose of the rule is to "further the attorney's fiduciary obligation to protect client property." *In re Sather*, 3 P.3d at 409.

¶ 28 To comply with Colo. RPC 1.15, a lawyer may establish a Colorado Lawyer Trust Account Foundation (COLTAF) account. *See* Colo. RPC 1.15(e), (h). The rules allow a lawyer to use COLTAF accounts for client or third party funds in a nominal amount and funds expected to be held for a short time. Colo. RPC 1.15(h)(2). Any interest earned by funds in COLTAF accounts exceeding the amount it costs the lawyer to maintain the account at a financial institution is paid directly to COLTAF. Colo. RPC. 1.15(h)(2)(b)-(c). *But see* Colo. RPC 1.15(h)(3) (if funds earn interest in significant excess of reasonable costs of maintaining account, lawyer shall request COLTAF to remit interest to lawyer for benefit of client or third party). COLTAF, a 501(c)(3) organization, uses the funds to support access to justice for low-income and other vulnerable Coloradans through grants to organizations that provide civil legal aid.

¶ 29 Subsection (b) of Colo. RPC 1.15 states that, when a lawyer receives funds "in which a client or third party has an interest, [the] lawyer shall, promptly or otherwise as permitted by law or by agreement with the client or third person, deliver to the client or third person any funds or other property that the client or third person is entitled to receive," and fully account for the funds if requested. However, according to Colo. RPC 1.15(c), "[i]f a dispute arises" between a client or third party concerning the entitlement to funds held in a lawyer's COLTAF account, the lawyer shall hold the disputed amount separate until the dispute is resolved.[6]

[11] ¶ 30 The comment to RPC 1.15 states that "[a] lawyer should hold property of others with the care required of a professional fiduciary." Colo. RPC 1.15 cmt. 1. However, Colo. RPC 1.15, like all of our Rules of Professional Conduct, defines ethical attorney conduct for purposes of professional discipline and does not serve as a basis for civil liability. Colo. RPC Preamble and Scope §§ 14, 19, 20; *see also Allen*, 252 P.3d at 482 n. 5; *Olsen & Brown*, 889 P.2d at 676.

## C.

### Application to this Case

¶ 31 The Providers argue Mintz owed them fiduciary duties based on the circum-

---

**6.** The Colorado Bar Association ("CBA") has provided additional guidance on issues faced by a lawyer when he holds client funds that may be owed to a third party non-client. Colo. Bar Ass'n Ethics Comm., Formal Op. 94 (1994) (hereinafter "CBA Ethics Comm., Formal Op. 94"). The CBA Ethics Committee writes that if the third party has an undisputed interest in funds held by a lawyer based on a statutory lien, contract, or court order, the lawyer should follow Colo. RPC 1.15(b) and promptly deliver funds owed to the third party. *Id.* However, "[w]here there is a dispute as to the validity or amount of the third party's claim," the lawyer should retain the disputed property in trust while he attempts to negotiate a settlement between the client and third party. *Id.* If the parties fail to agree, "the lawyer should interplead the property for dispo-

sition by the court." *Id.* The CBA Ethics Committee also advises that a lawyer should not induce a third party to rely on receiving client funds and then renege on the expectation, noting that we have privately disciplined lawyers for inducing a third party's reliance on receiving funds and then distributing the funds to the client without contacting the third party. *Id.*

Here, we defer to the trial court's factual finding that no dispute existed concerning the clients' medical bills at the time Mintz deposited his clients' settlement funds into his COLTAF account and notified his clients that he would pay the Providers. Whether the dispute arose before or after Mintz began withholding the Providers' funds is of no consequence to our holding.

stances of the parties' relationship and because Mintz was the trustee of funds in his COLTAF account to which they were entitled. In response, Mintz argues no fiduciary relationship to the Providers existed under the circumstances because the parties were engaged in arm's length business transactions and imposition of fiduciary responsibilities to third parties who claim funds in a lawyer's COLTAF account impinges on fiduciary duties the lawyer owes to his clients.

¶ 32 We agree with Mintz and find that the Providers may not maintain a breach of fiduciary duty tort action against Mintz based on his obligations as trustee of his COLTAF account. We thus reject the trial court's legal conclusion that, where a third party is entitled to funds held in an lawyer's COLTAF account, the lawyer owes to the third party fiduciary duties giving rise to a tort cause of action.

¶ 33 Although a COLTAF account is a "trust account," it is created and maintained by a lawyer for the benefit of the lawyer's clients within the unique structure of the disciplinary rules, a structure which protects and furthers the attorney-client relationship. *See Olsen & Brown,* 889 P.2d at 675–76. Even where a lawyer holds property of a third party that the lawyer acquired in connection with representation of a client, the lawyer's fiduciary obligations remain with the client. The lawyer's possession of third party property clearly gives rise to ethical obligations under Colo. RPC 1.15, but a rule imposing fiduciary obligations on a lawyer as trustee of funds owed to third parties in a COLTAF account would subject the lawyer to the possibility of tort liability for failing to act in the best interests of the third party with respect to those funds, interests that conflict with obligations the attorney owes the client.[7] *See* Restatement (Second) of Trusts § 170(1) (1959) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficia-

ry."). The rule of liability the Providers urge in this case would jeopardize the lawyer's undivided loyalties to his client. *See Biller Assocs. v. Peterken,* 269 Conn. 716, 849 A.2d 847, 852–53 (2004) ("[A] rule creating a fiduciary relationship between an attorney and a third party claiming an interest in the funds of the attorney's client would jeopardize a central dimension of the attorney-client relationship, namely, the attorney's duty of undivided loyalty to his or her client." (Internal quotation marks omitted)).

¶ 34 Here, Mintz represented his clients in negotiations with insurance companies and in negotiations with the Providers to accept reduced amounts for medical services. Mintz's fiduciary obligations remained with his clients. This should have been clear to the Providers given the Providers' negotiations with Mintz concerning his clients' payment amounts for medical services. Settlement funds collected by Mintz were the clients' funds despite Mintz's and the clients' obligation to pay the Providers out of the funds. In our view, the Providers' entitlement to such funds is satisfied by the payment of money the clients owed the Providers, effectuated through the interpleader award in the first trial in this case. The fact that Mintz served as trustee of the account containing the funds does not give rise to a breach of fiduciary duties cause of action against Mintz for failing to act in the best interests of the Providers with respect to those funds.

¶ 35 When it ruled on a similar suit against an attorney, the Colorado Court of Appeals reached the same result we reach today. In that case, the court held that an attorney did not owe fiduciary duties to third parties who claimed an entitlement to funds disbursed to the attorney's client from the attorney's trust account. *Klancke v. Smith,* 829 P.2d 464, 465–67 (Colo.App.1991). The attorney, who represented a widow in a wrongful death action on behalf of her deceased husband, disbursed funds to his client rather than to

---

7. We acknowledge that in this case, the trial court found that the interests of Mintz's clients and the Providers were aligned at the time Mintz received and deposited the settlement funds into his COLTAF account: the clients directed Mintz to pay the Providers, and the Providers wished to receive their funds. However, the interests of Mintz's clients changed after he acknowledged that he had withheld funds from the Providers in order to investigate the Providers' billing practices on behalf of his clients. Nearly all clients agreed with Mintz to pursue such an investigation; at that time, the interests of the Providers and the clients directly conflicted.

three children who were entitled to a portion of the proceeds as survivors by statute. *Id.* at 466. Our court of appeals affirmed the trial court's ruling that the attorney owed no fiduciary duties to the children because an attorney must act in the best interest of his or her client and is not liable in tort to third parties unless the attorney's conduct is fraudulent or malicious. *Id.* at 466–67.

¶ 36 Our cases concerning the attorney's duties to third parties owed funds held by the attorney, and the vast majority of analogous cases from other jurisdictions, are exclusively in the attorney discipline and contract enforcement context.[8] In *People v. Nulan,* 820 P.2d 1117, 1118, 1120 (Colo.1991), we suspended a lawyer's license after he gave in to pressure from his client to withdraw funds from his COLTAF account in violation of a purchase agreement to hold the funds in escrow pending the close of a real estate transaction. We wrote that the lawyer "assumed the fiduciary responsibilities of a trustee" when he accepted escrowed funds into his COLTAF account, and breached his duties when he allowed his client to withdraw the funds. *Id.* at 1119. However, *Nulan* arose in the context of our role overseeing the attorney discipline system and we did not purport to subject an attorney to tort liability as a fiduciary to third parties who may have adverse interests to a client. Further,

*Nulan* accords with the general rule that where an attorney assumes an escrow function in connection with his representation of a client, he assumes fiduciary obligations in connection with the funds in escrow. *See id.;* Colo. RPC 1.15 cmt. 6 ("[A] lawyer who serves as escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction."); 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 6:4, at 570 (2012 ed.) ("An attorney does not have a duty of loyalty to a nonclient. An exception is if the attorney assumed an escrow function.").

¶ 37 The extensive edifice of the attorney regulation and discipline system, and actions to enforce contracts and other agreements between parties, adequately protects third parties entitled to funds held in a COLTAF account. Our ethical rules require a lawyer to deliver funds owed to a third party when contractually required to do so, even if the client directs the lawyer otherwise. Colo. RPC. 1.15(b); Colo. RPC 1.15 cmt. 5 (recognizing that third parties, such as the client's creditors, may have valid claims to funds in a lawyer's custody); *see, e.g., In re Fischer,* 89 P.3d 817, 819, 822 (Colo.2004) (suspending a lawyer's law license for following his client's request to disburse funds in violation of settlement agreement). But, we see a signifi-

---

8. For a few examples of cases from other jurisdictions in the disciplinary context, see *In re Kirby,* 766 N.E.2d 351, 351 (Ind.2002) (mem.) (approving a public reprimand for attorney who failed to disburse settlement funds to doctor with valid medical lien); *In re Norman,* 708 N.E.2d 867, 868 (Ind.1999) (per curiam) (publicly reprimanding and admonishing attorney for failing to deliver settlement funds owed to doctor per signed agreement); *In re Moore,* 769 So.2d 1180, 1181 (La.2000) (per curiam) (suspending attorney from practice of law for six months for negligently breaching Rule 1.15 of Rules of Professional Conduct when she failed to disburse funds to doctor per medical lien); *In re Moore,* 129 N.M. 217, 4 P.3d 664, 666–67 (2000) (per curiam) (suspending attorney from practice of law for eighteen months for failing to comply with doctor's lien on client's settlement funds); *In re Rawson,* 113 N.M. 758, 833 P.2d 235, 238–39 (1992) (per curiam) (disbarring attorney for various ethical violations, including failure to honor assignment of client's settlement funds to doctors who treated client); *State of Okla. ex rel. Okla. Bar Ass'n v. Taylor,* 4 P.3d 1242, 1249–51 (Okla.2000) (suspending attorney for thirty days for various ethical violations, including mishandling of funds of third party, after attorney failed to pay doctor from client settlement proceeds).

For examples in the contract or lien enforcement context, see *Romero v. Earl,* 111 N.M. 789, 810 P.2d 808, 809–10 (1991) (doctor's lien is source of doctor's enforceable right of action against attorney for failing to pay doctor out of settlement funds in breach of lien agreement); *Yorgan v. Durkin,* 290 Wis.2d 671, 715 N.W.2d 160, 164 (2006) (rejecting chiropractor's right to enforce lien against attorney in contract where only client, not attorney, signed lien); *Riegleman v. Krieg,* 271 Wis.2d 798, 679 N.W.2d 857, 866 (App.2004) (doctor's lien on settlement proceeds signed by attorney is "unambiguous contract creating an assignment that is enforceable under contract law"); *Winship v. Gem City Bone & Joint, P.C.,* 185 P.3d 1252, 1258 (Wyo.2008) (medical provider assigned claim to settlement proceeds may collect funds from attorney who disbursed funds to client in violation of assignment).

cant difference between imposing on a lawyer an ethical duty to deliver to a third person funds the third person is entitled to receive, and subjecting the lawyer to potential tort liability in regard to funds in a COLTAF account maintained for the primary benefit of the client.

¶ 38 The Providers and Mintz had a contractual business relationship and dealt at arm's length for the payment of clients' medical bills from insurance settlement proceeds. In the interpleader action, the Providers recovered in quantum meruit from the COLTAF account all funds they were entitled to for the medical services they had provided. We agree with the court of appeals that the trial court erred in ruling that the Providers could also recover from Mintz under a breach of fiduciary duty tort theory.

### III.

¶ 39 Accordingly, we affirm the judgment of the court of appeals.