Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 4, 2018

**2018 CO 49**

**No. 17SA64, <u>Renfandt v. New York Life Insurance Company</u>—Life insurance policies—Suicide exclusion clauses.**

In this opinion, the Colorado Supreme Court answers a question of state law certified by the United States District Court for the District of Colorado.  The question asks us to interpret the meaning of the words "suicide, sane or insane," when used in life insurance policies.    The Colorado Supreme Court concludes that, under Colorado law, a life insurance policy exclusion for "suicide, sane or insane" excludes coverage only if the insured, whether sane or insane at the time, committed an act of self-destruction with the intent to kill himself.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2018 CO 49**

**Supreme Court Case No. 17SA64**
*Certification of Question of Law*
United States District Court for the District of Colorado
Case No. 16CV01812-MSK-GPG

**Plaintiff:**

Melissa Kay Renfandt,

v.

**Defendant:**

New York Life Insurance Company.

**Certified Question Answered**
*en banc*
June 4, 2018

**Attorneys for Plaintiff:**
Keating Wagner Polidori Free, P.C.
Zachary C. Warzel
Daniel A. Wartell
Lidiana Rios
Ross W. Pulkrabek
    *Denver, Colorado*

**Attorneys for Defendant:**
Hall & Evans, L.L.C.
Kevin E. O'Brien
Gillian Dale
    *Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
McDermott Law, LLC
Timothy M. Garvey
*Denver, Colorado*

**Attorneys for Amicus Curiae American Council of Life Insurers:**
Squire Patton Boggs (US) LLP
Aaron A. Boschee
*Denver, Colorado*

Squire Patton Boggs (US) LLP
Mary Jo Hudson
Holly W. Wallinger
Nicholas P. Zalany
*Columbus, Ohio*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.

¶1 While appearing to be in a "zombie-like" state from a combination of prescription medication, alcohol, and marijuana, Mark Renfandt shot himself in the head and died. When Mark's wife tried to collect life insurance benefits under a temporary coverage agreement issued by New York Life Insurance Company, the insurer denied the claim, citing a provision in the agreement that excluded coverage for "suicide . . . while sane or insane."

¶2 Mark's wife sued New York Life in state court, asserting breach of contract and other claims. She argues that Mark's death was not a suicide because the combination of substances that Mark ingested rendered him so intoxicated that he was unable to act volitionally or form suicidal intent when he shot himself. Thus, she contends, the policy's suicide exclusion does not apply to Mark's death.

¶3 New York Life removed the case to federal court and moved to dismiss the complaint. It maintains that the term "suicide" must be read in conjunction with the phrase "sane or insane," and that this additional language in the agreement was meant to remove any inquiry into whether the decedent intended to kill himself.

¶4 The United States District Court for the District of Colorado determined that the meaning of "suicide . . . while sane or insane" is unclear under Colorado law, and certified the question to this court under C.A.R. 21.1:

> Under Colorado law, does a life insurance policy's exclusion for "suicide, sane or insane" exclude coverage (1) for all acts of self-destruction without regard to the insured's intent or understanding of the nature and consequences of his/her actions or (2) for only acts of self-destruction committed when the insured intends to take his/her own life or understands the nature and consequences of his/her actions?

3

¶5    The meaning of the term "suicide" in the context of an insurance policy exclusion—and how to construe such an exclusion when the term "suicide" is modified by the words "sane or insane"—are questions that have divided English and American courts since the early nineteenth century. Several American courts have held that the phrase "suicide, sane or insane" refers to acts of self-destruction regardless of whether the decedent understood the physical nature or consequences of his act or had a conscious purpose to take his life—in other words, regardless of whether the decedent acted with an intent to kill himself. Others have concluded that, for a death to be considered a suicide, the decedent must have intended to kill himself, and that the additional words "sane or insane" do not negate the essential requirement of suicidal intent.

¶6    This disagreement appears to stem from different concepts of the term "suicide." Some courts conceive of "suicide" broadly to mean any act of self-destruction. Others treat "suicide" as a concept that requires the decedent to be aware of the physical nature and consequences of his act, and to intend to kill himself. Under this view, "suicide" is limited to acts of intentional self-destruction; it is the deliberate termination of one's existence.

¶7    This court has sided with the latter view, indicating in Lockwood v. Travelers Insurance Co., 498 P.2d 947, 951 (Colo. 1972), that suicide requires both a voluntary act (in that case, consciously pulling a trigger) and suicidal intent (i.e., an intent to cause one's own death). Today, we reaffirm this view of the term "suicide" and conclude that the additional words "sane or insane" do not negate the requirement that the "suicide"

4

be an act of self-destruction taken with the intent to cause one's own death. Thus, we answer the certified question: under Colorado law, a life insurance policy exclusion for "suicide, sane or insane" excludes coverage only if the insured, whether sane or insane at the time, committed an act of self-destruction with the intent to kill himself.

## I. Facts and Procedural History

¶8 The complaint alleges the following facts. Mark and Melissa ("Missy") Renfandt married in August 2014. The couple began the process of adopting a child, and in late November 2014, Mark applied for a life insurance policy with New York Life Insurance Company, naming Missy as the beneficiary. New York Life issued a temporary coverage agreement that insured Mark's life while the insurer considered his application. The agreement contained a provision excluding coverage for "suicide or intentionally self-inflicted injury . . . while sane or insane." One month later, on December 22, 2014, Mark died from a self-inflicted gunshot wound.

¶9 On the morning of his death, Mark took Tamiflu, per his doctor's instructions, and drove to work. (Mark also regularly took Diazepam, which he was prescribed for general anxiety, and Prilosec, an over-the-counter medication for heartburn.) After work, Mark and his employees celebrated the promotion of a project manager at the company. Mark had too much to drink, and had to be driven home.

¶10 Thirty minutes to an hour after Mark arrived home, Missy went downstairs to check on Mark and found him face down on the kitchen floor. Missy helped Mark onto a couch, and she returned to their upstairs bedroom. A short while later, Missy heard a

thump and went downstairs, where she found Mark had fallen partly off the couch. Missy helped him back onto the couch, and she again retreated to their bedroom.

¶11 About half an hour later, Missy heard the door open from the kitchen to the garage, where Mark stored his edible marijuana products. Missy came back downstairs and found Mark "sleepwalking, zombie-like, with a blank, glazed-over look in his eyes." Mark was unresponsive. Missy put Mark back onto the couch, and she returned, once more, to their bedroom.

¶12 Later that night, Missy awoke, sensing her husband's presence in the bedroom. Missy saw Mark open the drawer where they kept a loaded handgun. Mark dangled the gun in his left hand and said nothing; instead, he "stared blankly ahead, completely unresponsive and appearing to be in a sleepwalking state, unaware of his surroundings or his actions." Missy, believing Mark to be sleepwalking and not wanting to startle him, slowly moved toward him to take the gun away. But the gun fired, shooting Mark in the head and killing him.

¶13 The coroner's death certificate listed the manner of Mark's death as "suicide." A toxicology report showed that Mark's blood alcohol concentration ("BAC") was 0.325%.[1] The report contained an annotation stating, "BAC: coma, alcohol poisoning."

---

[1] According to the National Institute of Health, a BAC between 0.31% and 0.45% is considered "life threatening," and can cause "loss of consciousness, danger of life-threatening alcohol poisoning, [and] significant risk of death in most drinkers due to suppression of vital life functions." Compl. at ¶ 26 (citing National Institute on Alcohol Abuse and Alcoholism, "Alcohol Overdose: The Dangers of Drinking too Much," https://pubs.niaaa.nih.gov/publications/AlcoholOverdoseFactsheet/Overdosefact.htm).

The report also showed that Mark had clonazepam and marijuana in his system at the time of his death. The toxicologist did not test for Tamiflu.

¶14 Nine months after Mark's death, Missy submitted a claim for benefits under Mark's temporary coverage agreement with New York Life. New York Life denied the claim because "[a]ccording to the death certificate, police report, and coroner's report," Mark had committed suicide, and the agreement did not cover "suicide or intentionally self-inflicted injury . . . while sane or insane."

¶15 Missy filed a complaint against New York Life in Garfield County district court, asserting claims for breach of contract, breach of duty of good faith and fair dealing, and unjust enrichment. The insurer removed the case to federal district court and moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. The federal district court denied the motion without prejudice and certified the following question of law to this court:

> Under Colorado law, does a life insurance policy's exclusion for "suicide, sane or insane" exclude coverage (1) for all acts of self-destruction without regard to the insured's intent or understanding of the nature and consequences of his/her actions or (2) for only acts of self-destruction committed when the insured intends to take his/her own life or understands the nature and consequences of his/her actions?

¶16 We accepted jurisdiction, as authorized by C.A.R. 21.1.

## II. Analysis

¶17 We are asked to determine the meaning, under Colorado law, of a provision in a life insurance policy excluding coverage for "suicide . . . while sane or insane." We first discuss relevant principles of interpretation governing insurance policies before turning

7

to the policy at issue here. To determine the meaning of a life insurance provision excluding coverage for "suicide, sane or insane," we consider the origins of the term "suicide" and the disagreement over its meaning in the insurance context, and we trace the debate that ensued when insurers began to add the words "sane or insane" to policy exclusions for suicide. We conclude that, in Colorado, the phrase "sane or insane" does not alter the requirement that the "suicide" be an act of self-destruction taken with intent to cause one's own death. Thus, under Colorado law, a life insurance policy exclusion for "suicide, sane or insane" excludes coverage only if the insured, whether sane or insane at the time, committed an act of self-destruction with the intent to kill himself.

## A. Principles Governing Insurance Policy Interpretation

¶18 A life insurance policy is a contract, the interpretation of which is a matter of law that we review de novo. Cary v. United of Omaha Life Ins. Co., 108 P.3d 288, 290 (Colo. 2005). As with any contract, we construe its terms to promote the parties' intent. Id. Where general language in an insurance contract is ambiguous, we construe it against the insurer. See Thompson v. Md. Cas. Co., 84 P.3d 496, 501 (Colo. 2004). Where the language is undefined, we interpret it according to its plain meaning. Id. When determining the plain and ordinary meaning of words, we may consider definitions in a recognized dictionary. Hecla Mining Co. v. N.H. Ins. Co., 811 P.2d 1083, 1090 (Colo. 1991). Finally, when seeking to avoid coverage based on a policy exclusion, the insurer must establish that the exclusion applies in the case, and that the exclusion is not subject to any other reasonable interpretation. See id.

## B. Felonious Suicide under English Common Law

¶19　At common law in England, suicide was a "peculiar species of felony." 4 William Blackstone, Commentaries on the Law of England 189 (1769). It was considered "self murder," and a person who committed suicide was a "felo de se"—a felon against himself. Id. at 188–89.[2] To be a felo de se, the decedent must have "deliberately put[ ] an end to his own existence" and have been "compos mentis"—of sound mind. Id. at 189. In other words, "in order to make the act committed by him amount to suicide," the decedent must have been "a responsible moral agent at the time of his death." Schwabe v. Clift (1845) 175 Eng. Rep. 56, 57; 2 Car. & K. 134, 137.

¶20　Under English common law, a person who could not, due to some affliction, distinguish between "good and evil" or "right from wrong" was considered "non compos mentis." See Borradaile v. Hunter (1843) 134 Eng. Rep. 715, 728; 5 Man. & G. 638, 669 (Tindal, J.) (recognizing that whether a person was "capable of judging between right and wrong . . . is the test that is frequently applied to the determination of the question" of whether a person was "compos mentis" or not). Persons who were "under a natural disability of distinguishing between good and evil," including "Lunaticks," were "not punishable by any criminal prosecution whatsoever." 1 W. Hawkins, A Treatise of the Pleas of the Crown 2 (London, Eliz. Nutt and R. Gosling, 1721). Thus, in the case of madness, an act of self-destruction could be "subject to no

---

[2] Because such a felon had, through his death, removed himself from the reach of the law, the punishment was taken out on his reputation and fortune, through "ignominious burial in the highway, with a stake driven through [the decedent's] body" and "forfeiture of all his goods and chattels to the king." Id. at 190.

imputation of guilt" because such a man was deemed "under no moral guidance." Charles Moore, <u>A Full Inquiry into the Subject of Suicide</u> 4 (London, J.F. and C. Rivington, 1790).

¶21     In short, for a person to commit felonious "suicide" under English common law, he must have deliberately ended his life <u>and</u> have understood the moral character of his act of self-destruction.

### C. "Suicide" Exclusions – English Courts

¶22     In the nineteenth century, life insurance providers began to add suicide clauses to policies. These clauses typically rendered the policy void if the insured killed himself. The question soon arose whether these provisions for "suicide" (or analogous references to acts of self-destruction) encompassed all acts of intentional self-destruction or instead were limited to acts of <u>felonious</u> suicide—and thus required the insured to have understood the moral character of his act. English courts grappled with this issue in two leading decisions, <u>Borradaile v. Hunter</u>, and <u>Clift v. Schwabe</u>.

¶23     In <u>Borradaile v. Hunter</u> (1843) 134 Eng. Rep. 715, 722; 5 Man. & G. 639, 653, the insured threw himself into the river Thames and drowned. The insurance company denied payment under the decedent's life insurance policy, relying on a provision deeming the policy void if the insured should "die by his own hand or by the hands of justice, or in consequence of a duel." <u>Id.</u> at 725; 5 Man. & G. at 661. The estate of the decedent sued. After a trial, the jury found that "Mr. Borradaile voluntarily threw himself from the bridge with the intention of destroying life; but at the time of committing the act, he was not capable of judging between right and wrong." <u>Id.</u> at

10

717; 5 Man. & G. at 643. The trial court entered judgment for the insurance company. Id.; 5 Man. & G. at 643.

¶24 The Court of Common Pleas allowed the ruling for the insurance company to stand. Because the jury verdict amounted to a finding that the insured was non compos mentis at the time he killed himself, all agreed that the decedent would not be culpable if this were a question of crime. Id. at 721; 5 Man. & G. at 651–52. The dispute centered on the meaning of the term "die by his own hand," and whether the decedent's intentional act of self-destruction voided the policy if he was "insane" at the time and thus was "incapable of distinguishing right from wrong." Id. at 718; 5 Man. & G. at 645.

¶25 Justice Thomas Erskine, among the majority, reasoned that the insurance company used the phrase "die by his own hand" specifically to avoid importing a criminal notion of self-destruction inherent in the term "suicide." See id. at 724–25; 5 Man. & G. at 660–61. He concluded that the policy required only that "the act of self-destruction should be the voluntary and willful act of a man having at the time sufficient powers of mind and reason to understand the physical nature and consequences of such act, and having at the time a purpose and intention to cause his own death by that act." Id. at 723–24; 5 Man. & G. at 657–58. The decedent's ability to understand "the moral nature and quality of his purpose" was not relevant to the inquiry. Id.; 5 Man. & G. at 658.

¶26 Chief Justice Nicholas Tindal disagreed, arguing that because the phrase "die by his own hand" was synonymous with the term "suicide" — that is, criminal suicide — "the insurers intended by the proviso to confine their exemption from liability to the

11

case of a felonious suicide only." Id. at 728; 5 Man. & G. at 669. In this case, Chief Justice Tindal reasoned, the decedent had not truly "die[d] by his own hand" because "the result of the finding of the jury is that the assured killed himself intentionally, but not feloniously." Id. at 727; 5 Man. & G. at 667 (emphasis added).

¶27 A few years later, a different English court addressed a provision that deemed a policy void if the insured "commit[ted] suicide." Clift v. Schwabe (1846) 136 Eng. Rep. 175, 179; 3 C.B. 437, 447. In that case, the insured killed himself by swallowing sulphuric acid, but under circumstances tending to show he was of unsound mind at the time. Id. at 178; 3 C.B. at 446. The trial judge reasoned that for the insured's intentional act of self-destruction to be suicide, "it must appear that the deceased was a responsible moral agent at the time of his death," and instructed the jury accordingly. Schwabe v. Clift (1845) 175 Eng. Rep. 56, 57; 2 Car. & K. 134, 137. The jury returned a verdict for the decedent, but the Exchequer Chamber reversed.[3] See 136 Eng. Rep. at 192; 3 C.B. at 480.

¶28 Similar to Borradaile, Clift hinged on whether the phrase "shall commit suicide," as used in the policy, merely required that the decedent "intentionally kill himself," or instead referred to a criminal act of suicide, that is, an intentional act of self-destruction under circumstances that would make the decedent a "felo de se." Id. at 184; 3 C.B. at 461. Baron Robert Rolfe, among the majority, reasoned that "suicide" refers to "every

---

[3] The Court of Exchequer Chamber was akin to a "super-en banc court including all of England's judicial officers," Hart v. Massanari, 266 F.3d 1155, 1165 n.13 (9th Cir. 2001), and heard appeals from the common law courts of record, see Court of Exchequer Chamber, Black's Law Dictionary (10th ed. 2014).

act of self destruction," "provided it be the intentional act of a party knowing the probable consequence of what he is about." Id. at 185; 3 C.B. at 464.

¶29 Chief Baron Frederick Pollock disagreed. After tracing the origin of the word "suicide" in early English sources, he reasoned that "the word has never been used by law writers, except in the sense of a criminal taking away of one's own life." Id. at 190; 3 C.B. at 476. Accordingly, he concluded, the term "suicide" in the policy meant criminal suicide. See id. at 191; 3 C.B. at 478.

¶30 In sum, the majority of judges in both Borradaile and Clift rejected a criminal law definition of "suicide" in the context of life insurance policies. Both majorities concluded that to void the policy, the decedent must have committed an intentional act of self-destruction, but he need not have understood its moral character.

## D. "Suicide" Exclusions - Early American Courts

¶31 The disagreement over the interpretation of life insurance policy exclusions for "suicide" and analogous references to acts of self-destruction carried over to this side of the Atlantic. By the late nineteenth century, there was a conflict of opinion:

> those on one side maintaining that the policy would be avoided if the assured, at the time of causing his own death, was conscious of the physical nature and consequences of his act, and intended thereby to put an end to his own life, and those on the other side maintaining that the policy would not be avoided unless the insured were also conscious of the moral quality or criminality of such act.

Adkins v. Columbia Life Ins. Co., 70 Mo. 27, 30 (1879) (emphases added).

¶32 Some American courts followed the Borradaile and Clift majorities, reasoning that an act of self-destruction voids coverage so long as the decedent understood the

13

nature of his act and thereby intended to take his own life. In <u>Dean v. American Mutual Life Insurance Co.</u>, 86 Mass. (4 Allen) 96, 98 (1862), for example, the Supreme Judicial Court of Massachusetts examined a policy, like in <u>Borradaile</u>, that voided coverage if the insured "die[d] by his own hand." The court reasoned that this phrase was "sufficiently broad to include every act of self-destruction, however caused, without regard to the moral condition of the mind of the assured, or his legal responsibility for his acts." <u>Id.</u> Thus, it held, the policy was voided even if the insured ended his life while "insane, entirely incapable of distinguishing between right and wrong, and without any just sense of moral responsibility," provided that he "retain[ed] sufficient powers of mind and reason to act with premeditation, to understand and contemplate the nature and consequences of his own conduct, and to intend the result which his acts are calculated to produce." <u>Id.</u> at 100.

¶33    Other early American courts interpreted such exclusions to refer to criminal acts of self-destruction, and thus, to require a decedent to be morally responsible by being mentally capable of discerning between right and wrong. <u>See, e.g.</u>, <u>Eastabrook v. Union Mut. Life Ins. Co.</u>, 54 Me. 224, 228 (1866) (interpreting the phrase "die by his own hand" to refer to felonious death, or felo de se, requiring moral blame); <u>Phadenhauer v. Germania Life Ins. Co.</u>, 54 Tenn. (7 Heisk.) 567, 576 (1872) (interpreting an exclusion for "suicide" to require a decedent to "understand the moral nature of the act of self-destruction," such that "if he is incapable of distinguishing between right and wrong," his act is not a suicide); <u>Life Ass'n of Am. v. Waller</u>, 57 Ga. 533, 537 (1876) ("In suicide, proper, there must be a moral element, and the presence of that depends upon

14

whether the man is so far rational as to be able to discern the difference between right and wrong.").

¶34    The U.S. Supreme Court followed this latter approach in <u>Mutual Life Insurance Company v. Terry</u>, 82 U.S. (15 Wall.) 580, 590–91 (1873). There, the life insurance policy contained a provision deeming the policy void if the insured "shall die by his own hand." After reviewing the decisions in <u>Borradaile</u>, <u>Clift</u>, and conflicting decisions emanating from American courts, the Supreme Court ultimately adopted a rule that encompassed criminal law principles, and held that this provision[4] does not apply if the death occurs when the insured's "reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences, and effect" of his act of intentional self-destruction. <u>Id.</u> at 591.

¶35    Two points are worth noting. First, despite the disagreement over whether "suicide" as used in these policies referred to criminal acts of self-destruction requiring moral culpability, courts uniformly agreed that "suicide" requires a voluntary and intentional act of self-destruction. Second, the Supreme Court recognized that a person's "unsoundness of mind" can impact whether an act of self-destruction is "suicide" (1) by preventing him from understanding the <u>moral</u> nature of his act of self-destruction (even if he understands the physical nature of his act and intends to cause his death); (2) by rendering him unable to understand even the physical nature and consequences of his act such that he lacks the <u>intent</u> to kill himself; or (3) by

---

[4] For purposes of its analysis, the Court saw no difference between the expressions "commit suicide, take his own life, or die by his own hands." <u>Id.</u> at 591.

15

creating in him an irresistible impulse compelling him to kill himself, thus making the act involuntary.  See Accident Ins. Co. v. Crandal, 120 U.S. 527, 531–33 (1887); Terry, 82 U.S. at 590–91.

## E. "Suicide, sane or insane"

¶36    In response to decisions refusing to enforce suicide exclusions where the insured was insane at the time of his death, insurance companies began to add the words "sane or insane" and "feloniously or otherwise" to these exclusions.  Bigelow v. Berkshire Life Ins. Co., 93 U.S. 284, 287 (1876).  Courts soon disagreed about the effect of these additional words.

¶37    On one side, the New York Court of Appeals held that the addition of the words "sane or insane" meant that the policy is voided "if death ensues from any physical movement of the hand or body of the assured proceeding from a partial or total eclipse of the mind."  De Gogorza v. Knickerbocker Life Ins. Co., 65 N.Y. 232, 241, 242 (1875).  Thus, if a "totally insane man blows his brains out with a pistol," he will have "died by his own hand" under the policy and can never recover unless his death was the "result of pure accident."  Id.

¶38    The dissent in De Gogorza maintained that some insane persons "can form intentions and act upon them" though unable "to distinguish between right and wrong," while others "cannot form intentions, are unconscious of the physical consequences of their acts, cannot control their actions, and . . . act from irresistible impulse; such persons can no more be said to act than an automaton."  Id. at 244 (Earl, J., dissenting).  The dissent thus construed the words "sane or insane" to mean that the

16

provision applied to "every case of voluntary intentional self-destruction . . . whether the assured was sane or insane," but did not apply to a case "where the act of self-destruction was not voluntary or intentional." Id. at 249.

¶39 Since 1875, many courts have adopted an approach similar to the majority in De Gogorza, holding that, for an insurer to avoid liability for death by self-destruction, while "sane or insane," it is "not necessary for the insured to realize the physical nature or consequence of his act or to form a conscious purpose to take his life." Atkinson v. Life Ins. Co. of Va., 228 S.E.2d 117, 120 (Va. 1976). In other words:

> If the act of self-destruction would be regarded as suicide in the case of a sane person, it would be so treated as to an insane insured, regardless of whether the insured decedent realized or was capable of realizing that such act would cause his death or whether he was capable of entertaining an intention to kill himself.

Id.; see also Nielsen v. Provident Life & Acc. Ins. Co., 596 P.2d 95, 97–98 (1979). This rule has been labeled the "majority view." Nielsen, 596 P.2d at 98.[5]

¶40 Meanwhile, the U.S. Supreme Court and several states adopted the so-called minority rule. In Bigelow v. Berkshire Life Ins. Co., 93 U.S. 284, 286 (1876), the Supreme Court noted that its earlier decision in Terry construed the phrase "die by his own hand" to refer to an act of criminal self-destruction, and thus did not apply to an insane person who took his life. The Court understood the insurer's addition of the words "sane or insane" as an effort to "avoid altogether this class of risks." Id. Yet the Court

---

[5] See also, e.g., U.S. Fid. & Guar. Co. v. Blum, 258 F. 897, 901 (9th Cir. 1919); Scarth v. Sec. Mut. Life Soc., 39 N.W. 658, 660 (Iowa 1888); Aetna Life Ins. Co. v. McLaughlin, 380 S.W.2d 101, 105–06 (Tex. 1964).

construed the words "sane or insane" only to remove any inquiry into whether the decedent understood the moral nature of his act. See id. at 287–88. Notably, the Court still required that the act of self-destruction be intentional: "Nothing can be clearer than that the words, 'sane or insane,' were introduced for the purpose of excepting from the operation of the policy any intended self-destruction, whether the insured was of sound mind or in a state of insanity." Id. at 287 (emphasis added); see also id. (reasoning that this language informed the policy holder that the company would not be liable "if he purposely destroyed his own life"). Thus, the Court reasoned, the policy was void "if the insured was conscious of the physical nature of his act, and intended by it to cause his death, although, at the time, he was incapable of judging between right and wrong, and of understanding the moral consequences of what he was doing." Id. (emphases added). Applying that construction to the facts of the case, the Court observed that the decedent "knew that he was taking his own life, and showed sufficient intelligence to employ a loaded pistol to accomplish his purpose; . . . [h]is darkened mind did not enable him to see or appreciate the moral character of his act, but still left him capacity enough to understand its physical nature and consequences." Id.

¶41 Other courts similarly have concluded that the addition of the phrase "sane or insane" does not eliminate the requirement that the decedent act with the intent to kill himself. In Searle v. Allstate Life Ins. Co., 696 P.2d 1308, 1315 (Cal. 1985), for example, the California Supreme Court held that "[a] proper interpretation of the clause is that it exempts the insurance company from liability only if the insured, whether sane or insane at the time, committed the act of self-destruction with suicidal intent." Thus, "if

18

the insured did not understand the physical nature and consequences of the act, whether sane or insane, then he did not intentionally kill himself." Id. at 1317. On the other hand, the court emphasized, insanity does not necessarily negate suicidal intent. See id. at 1318. Proof, for example, that the decedent killed himself under the compulsion of an irresistible impulse would establish that self-destruction was the intended result, albeit by a deranged mind. Id.

¶42 The so-called minority approach adopts the view that a policy exclusion for "suicide, sane or insane" still requires a "suicide." In other words, a decedent's insanity does not, under the minority approach, eliminate the requirement that the decedent act with intent to end his life.

## F. Colorado's Approach

¶43 In 1903, the Colorado General Assembly enacted a statute addressing suicide exclusions in life insurance policies, now codified at section 10-7-109, C.R.S. (2017). See Ch. 119, 1903 Colo. Sess. Laws 257, 257. As originally enacted, the statute prohibited life insurance companies from denying payment on a life insurance policy based on the suicide of the policyholder, "whether said suicide was voluntary or involuntary, and whether said policyholder was sane or insane." Head Camp Pac. Jur., Woodmen of the World v. Sloss, 112 P. 49, 50 (Colo. 1910). This court held that the statute was "capable of but one rational construction, namely, that it was the intent and purpose of the Legislature to prevent all companies, of whatsoever kind or character, issuing life insurance contracts, from escaping payment thereon, in the event of death, simply on the ground that the insured committed suicide." Id. The statute was later amended to

19

apply only "after the first policy year," see Aetna Life Ins. Co. v. Braukman, 70 F.2d 647, 648 (10th Cir. 1934), and was again amended in 1935 to state that it does not apply to accidental death policies, see McCowan v. Equitable Life Assur. Soc. of U.S., 179 P.2d 275, 276 (Colo. 1947).

¶44    Section 10-7-109 does not bar the provision at issue here (which excludes coverage for "suicide . . . while sane or insane") because the agreement was in effect less than one year when Mark died. Nevertheless, the statute reflects a longstanding public policy in Colorado that disfavors suicide exclusions.

¶45    We conclude that, in Colorado, a policy exclusion for "suicide . . . while sane or insane" still requires an insurer to show that the insured's death was a "suicide." In other words, an insurer must show that the decedent, while sane or insane, committed an act of self-destruction with the intent to kill himself. We reach this conclusion for several reasons.

¶46    First, the term "suicide" is commonly understood to mean an act of intentional self-destruction; the deliberate termination of one's existence. See, e.g., Suicide, Webster's Third New International Dictionary (3d ed. 1961) (defining "suicide" as the "the fact or an instance of taking one's own life voluntarily and intentionally"); 9A Steven Plitt et al., Couch on Ins. § 138:16 (3d ed. 2017) ("It is the 'deliberate' aspect, combined with the 'termination' aspect which differentiates suicide from the variety of voluntary acts in which people engage that present some risk to their lives, such as skydiving, 'racing trains,' and ingesting dangerous drugs."). Indeed, suicidal intent is what distinguishes "suicide" from an accidental or unintentional death. (One who

20

mistakenly ingests poison and dies, or who slips and falls from the edge of a cliff to his death, has not committed suicide.)

¶47 This court has recognized that "suicide," in the insurance context, requires the intent to end one's own life. In <u>Lockwood</u>, the insured held a life insurance policy with a double indemnity provision for accidental death. 498 P.2d at 948. The insured became intoxicated and shot himself in the head. <u>Id.</u> at 949. The insurer refused to pay the double indemnity, arguing that the insured had committed suicide, which was an excepted risk under the accidental death provisions in the policy. <u>Id.</u> at 948. The issue at trial was whether the plaintiff (the insured's widow) had proven that the insured's death was an accident and thus eligible for double indemnity. <u>See id.</u> at 950. The trial court rejected the insurer's tendered jury instruction stating that if the jury found that the deceased intentionally placed the gun to his head and fired the lethal shot, the jury would, in effect, be required to find that the deceased committed suicide. <u>Id.</u> at 951. We affirmed the trial court's rejection of this instruction, concluding that "[t]his is not a complete and therefore not an accurate statement of the law" because "[i]t omits any reference to the deceased's <u>state of mind or intent</u> at the time the gun went off." <u>Id.</u> (emphasis added). Our statement in <u>Lockwood</u> implicitly acknowledged that "suicide," by definition, requires an intent to end one's life. We reaffirm that view today.

¶48 Second, we disagree with New York Life that the additional words "sane or insane" renders a decedent's suicidal intent irrelevant. This view erroneously conflates insanity and intent. In past cases, we have drawn from concepts in criminal law to discern the meaning of "insanity" for purposes of an insurance provision limiting

21

coverage for self-inflicted injuries, "sane or insane." In <u>London Guarantee & Accident Co. v. Officer</u>, 242 P. 989, 991 (Colo. 1925), for example, we reasoned that a person is "insane" (for purposes of the statute now codified at section 10-7-109) if he is "so mentally diseased that he has no capacity to understand the nature of the act and no ability to distinguish between right and wrong." Our description of insanity in that case comports with Colorado's longstanding test of "insanity" in the criminal law meaning "[a] person who is so diseased or defective in mind at the time of the commission of the act as to be incapable of distinguishing right from wrong." <u>See</u> § 16-8-101(1), C.R.S. (2017) (applicable to offenses committed before July 1, 1995); § 16-8-101.5(1), C.R.S. (2017) (same) (applicable to offenses committed on or after July 1, 1995). In 1995, the legislature modified the test for insanity to fold in the former affirmative defense for "impaired mental condition."[6] Thus, under Colorado criminal law, "insanity" now also refers to a condition of the mind caused by a mental disease or defect that prevented the person from forming a culpable mental state that is an essential element of a crime charged. <u>See</u> § 16-8-101.5(1)(b), C.R.S. (2017). But this does not mean that the added words "sane or insane" in a policy exclusion for suicide render a decedent's suicidal intent irrelevant.

---

[6] <u>See</u> § 16-8-101.3, C.R.S. (2017) (declaring that the legislative intent in enacting section 16-8-101.5 was to combine the defense of not guilty by reason of insanity and the affirmative defense of impaired mental condition); <u>see also</u> § 16-8-102(2.7), C.R.S. (2017) (defining "[i]mpaired mental condition" as "a condition of mind, caused by mental disease or defect that prevents the person from forming the culpable mental state that is an essential element of any crime charged").

¶49    Certainly, a person can be sane and commit an act of self-destruction, yet lack intent to kill himself. For example, a sane person who, distracted by a text on his phone, steps out into an intersection in front of an oncoming bus has no intent to kill himself, although his act results in death. The same is true of a sane person who places a gun to his head as a joke and pulls the trigger and dies, mistakenly believing the weapon to be unloaded. It is also possible for a person to be insane, yet still act intentionally to kill himself. For example, an insane person who deliberately throws himself off a rooftop—because he imagines he is being pursued by aliens who will torture him—still acts with intent to kill himself, even if his reason for doing so is wholly delusional.

¶50    But to the extent that a person's insanity can, in some cases, render him unable to understand even the physical nature and consequences of his act—and thus negate his intent to kill himself—such lack of intent means only that his act of self-destruction is not, in fact, a "suicide." It does not change the requirement that his act of self-destruction constitute a suicide for the exclusion to apply. Put differently, if the insured—whether he was sane or insane—did not understand the physical nature and consequences of the act, then he did not intentionally kill himself. In that event, there is simply no "suicide."

¶51    Third, our construction of the phrase "suicide . . . while sane or insane" comports with the underlying purpose of the one-year provision in section 10-7-109, which is to protect insurance companies from fraud by persons who purchase life insurance policies when they intend to kill themselves. Cf. Ownbey v. Gen. United Life Ins. Co.,

23

524 P.2d 636, 647 (Colo. App. 1974) (discussing similar Utah statute).  Such provisions protect insurers from a "risk" that lies wholly in the control of the insured.  <u>Couch on Insur.</u>, § 138:15.  To apply the exclusion to an individual who lacks suicidal intent is inconsistent with the purpose of such provisions.

¶52    In sum, we conclude that, in Colorado, a policy exclusion for "suicide . . . while sane or insane" still requires an insurer to show that the insured's death was a "suicide."  In other words, an insurer must show that the decedent, while sane or insane, committed an act of self-destruction with the intent to kill himself.  Here, Plaintiff concedes that if Mark committed suicide (that is, if he intentionally ended his own life), the suicide exclusion bars coverage, regardless of whether he was sane or insane.  However, New York Life must first establish that there was a "suicide"—that Mark intended to kill himself.[7]

## III.  Conclusion

¶53    We conclude that, in Colorado, the phrase "sane or insane" does not alter the requirement that the "suicide" be an act of self-destruction taken with intent to cause

---

[7] We note that this case concerns not mental illness but intoxication.  We further note that under Colorado criminal law, "intoxication" and "insanity" are not the same thing.  <u>See</u> § 18-1-804(2), C.R.S. (2017) ("[i]ntoxication does not, in itself, constitute mental disease or defect" for purposes of insanity); <u>see also</u> § 16-8-101.5(2)(b), C.R.S. (2017) ("[m]ental disease or defect" includes "only those severely abnormal mental conditions . . . that are not attributable to the voluntary ingestion of alcohol or any other psychoactive substance").  That said, a criminal defendant may offer evidence of intoxication when it is relevant to negate the element of specific intent.  <u>See</u> § 18-1-804(1), C.R.S. (2017).  Here, the complaint alleges that the combination of prescription medication, alcohol, and drugs that Mark ingested rendered him so severely intoxicated that he was "unable to act volitionally or form suicidal intent."  Compl. ¶ 41.

one's own death.  Thus, we answer the certified question: under Colorado law, a life insurance policy exclusion for "suicide, sane or insane" excludes coverage only if the insured, whether sane or insane at the time, committed an act of self-destruction with the intent to kill himself.