Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
January 14, 2019

**2019 CO 5**

**No. 17SC139, *School Dist. No. 1 v. Denver Classroom Teachers Ass'n* — Labor and Employment — Collective Bargaining — Contract Interpretation.**

A dispute arose between a school district and a teachers' association regarding whether, pursuant to the terms of several collective bargaining agreements, the school district was required to compensate teachers for attending English Learning Acquisition (ELA) training. The trial court found the agreements ambiguous and asked the jury to interpret them. The jury, in turn, returned a verdict for the teachers' association. The school district appealed, and the court of appeals affirmed. The supreme court now affirms the judgment of the court of appeals, albeit on slightly different grounds. The court acknowledges that the agreements contain a management rights clause, which grants the school district control over all lawful rights and authority not expressly addressed in the agreements. But because the "In-Service Education" provision in the agreements is fairly susceptible to being interpreted as expressly requiring payment for ELA training, the court cannot conclude that the management rights clause allows the school district to refuse to pay for such training. Therefore, the supreme court agrees

with the court of appeals that the pertinent contract provisions are ambiguous and that their interpretation was correctly submitted as a factual issue to the jury.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2019 CO 5

---

### Supreme Court Case No. 17SC139
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 15CA0965

---

### Petitioners:

School District No. 1 in the County of Denver and State of Colorado and Board of Education of School District No. 1 in the County of Denver and State of Colorado,

v.

### Respondent:

Denver Classroom Teachers Association.

---

### Judgment Affirmed
*en banc*
January 14, 2019

---

**Attorneys for Petitioners:**
Semple, Farrington & Everall, P.C.
M. Brent Case
Jonathan P. Fero
    *Denver, Colorado*

**Attorney for Respondent:**
Sharyn E. Dreyer
    *Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1    The English Learning Acquisition (ELA) program aims to assist students who have limited English language proficiency.  A federal court's Consent Order requires School District No. 1 in Denver and its Board of Education (collectively "the District") to staff teachers who are "fully qualified" to teach English language learners.  Starting in the mid-1990s, the District compensated its teachers for ELA training.[1]  But the District discontinued that practice after the 2006–07 school year.

¶2    Believing that the decision to stop paying teachers for ELA training violated a series of the parties' Collective Bargaining Agreements (CBAs),[2] the Denver Classroom Teachers Association (DCTA) pursued a grievance against the District that was referred to nonbinding arbitration and resulted in a recommendation in favor of the DCTA.  Because the District declined to adopt that recommendation, however, the DCTA brought this suit asserting a breach-of-contract claim against the District.  The trial court ruled that the relevant provisions of the CBAs are ambiguous and that their interpretation was, therefore, an issue of fact for the jury.  The jury, in turn, found the District liable for breach of contract and awarded damages to the DCTA.  A division of the court of appeals

---

[1] For the sake of brevity, throughout this opinion we refer to compensation or payment for time spent in ELA training as compensation or payment for ELA training.

[2] The District and the DCTA have entered into several CBAs and extensions: the 2005–08 CBA, the 2008–11 CBA, the 2011–12 Extension, and the 2012–15 Extension (collectively "the CBAs").  By and large, the extensions adopted the CBA provisions with few modifications of no relevance here.

subsequently affirmed the judgment of the trial court. We now affirm the judgment of the court of appeals, albeit on slightly different grounds.

¶3 We conclude that the interpretation of the CBAs was properly submitted as an issue of fact to the jury because the CBAs are ambiguous regarding payment for ELA training. We are mindful that the management rights clause in the CBAs confers to the District broad rights that are constrained only by express terms to the contrary. But because the CBAs are fairly susceptible to being interpreted as *expressly* requiring compensation for ELA training, we cannot conclude that the management rights clause includes the right to refuse to pay for ELA training. This is not a situation in which the CBAs are silent on the issue of compensation for ELA training. Therefore, we disagree with the District that our decision in *City and County of Denver v. Denver Firefighters Local No. 858* (*Denver Firefighters*), 2014 CO 15, 320 P.3d 354, is dispositive. Because *Denver Firefighters* is factually distinguishable, it is of no avail to the District.

## I. Facts and Procedural History

¶4 The District is responsible for educating at least 30,000 students whose first language is not English. Under a federal court's Consent Order, the District is required to employ "fully qualified" teachers for these students. The District's teachers must do one of two things to become fully qualified: (1) get a state endorsement to teach English language learners (by obtaining a state-approved master's degree), or (2) complete ELA training within two years of being hired. Beginning in the mid-1990s, the District paid its teachers for ELA training. But in 2008, the District decided it would no longer do so.

3

In lieu of compensation, the District began to offer teachers academic course credit for ELA training.

¶5     Unhappy with this change in policy, the DCTA pursued a grievance.  Following nonbinding arbitration proceedings that culminated in a recommendation that was favorable to the DCTA but was rejected by the District, the DCTA brought this suit for breach of contract.  Before trial, the District moved for summary judgment.  Relying on the management rights clause, the District argued that the CBAs unambiguously establish that it retains the right to refuse to pay for ELA training.  The trial court disagreed, concluded that the CBAs are ambiguous, and asked the jury to interpret the pertinent contract provisions.  The jury found that the CBAs require payment for ELA training, returned a verdict for the DCTA on the breach-of-contract claim, and awarded the DCTA damages in excess of $1.1 million.

¶6     A division of the court of appeals affirmed, concluding that the jury was properly asked to ascertain the meaning of the relevant contract provisions because the CBAs are ambiguous regarding compensation for ELA training.  *Denver Classroom Teachers Ass'n v. Sch. Dist. No. 1 in Denver & Colo.* (*Denver Classroom Teachers*), 2017 COA 2, ¶¶ 13–18, __ P.3d __.  The division acknowledged that the CBAs contain a management rights clause, which gives the District control over "[a]ll lawful rights and authority" not expressly addressed in the CBAs.  *Id.* at ¶ 14.  It further recognized that ELA training is a posted job requirement and the CBAs are silent on whether the District is required to pay teachers for fulfilling a posted job requirement.  *Id.* at ¶¶ 15–16.  But the division observed that the CBAs require "payment for work beyond the forty-hour week, and . . . the ELA

4

training may fall into that category." *Id.* at ¶ 17. Thus, reasoned the division, the CBAs are "fairly susceptible to being interpreted to require payment" for ELA training. *Id.*

¶7 Notably, the division found unpersuasive the District's reliance on *Denver Firefighters*:

> [I]n that case the supreme court determined that the CBA in question unambiguously gave the city the right to draft and implement the disputed terms. Here, in contrast, we have concluded that the CBAs are ambiguous regarding payment for ELA training. Therefore, although management rights clauses provide expansive rights under certain circumstances, those circumstances are not present in this case.

*Id.* at ¶ 18. This appeal followed.[3]

## II. Analysis

¶8 The court of appeals determined that, since the provision in the CBAs requiring payment for work beyond the forty-hour week may include ELA training, the CBAs are fairly susceptible to being interpreted as requiring payment for such training. *Id.* at ¶¶ 16–17. The District contends that the court of appeals improperly narrowed the scope of the holding in *Denver Firefighters* by giving short shrift to the management rights clause in the CBAs. Relying on the management rights clause, the District urges that it retains

---

[3] We granted certiorari to review the following question:

> Whether the court of appeals improperly narrowed this Court's decision in *City and County of Denver v. Denver Firefighters Local No. 858*, 320 P.3d 354 (Colo. 2014), by failing to credit expansive management rights clauses and finding ambiguity where collective bargaining agreements did not expressly limit the authority to require teachers to complete ELA training as a job condition without additional compensation.

5

the right to refuse to pay for ELA training because the CBAs do not expressly address compensation for the fulfillment of a posted job requirement. We are unpersuaded.

¶9 The CBAs require payment for "Extra Duty," including "In-Service Education," and we conclude that the term "In-Service Education" is fairly susceptible to being interpreted as including ELA training. Therefore, we agree with the court of appeals that the trial court properly submitted the interpretation of the pertinent contract provisions to the jury.[4]

¶10 In addressing the merits of the District's position, we analyze the relevant provisions of the CBAs and review our decision in *Denver Firefighters*. Before doing so, though, we take a moment to set forth the standard of review that governs this appeal and the tenets of contract interpretation that guide our decision.

## A. Standard of Review

¶11 The interpretation of a contract presents a question of law. *Laleh v. Johnson*, 2017 CO 93, ¶ 18, 403 P.3d 207, 211. Therefore, we review the judgment of the court of appeals de novo. *Denver Firefighters*, ¶ 7, 320 P.3d at 357.

---

[4] Our conclusion renders inconsequential the District's assertion based on the CBAs' lack of express terms regarding compensation for the fulfillment of a posted job requirement.

6

## B. Tenets of Contract Interpretation

¶12 Our primary goal when we interpret a contract is to discern and effectuate the parties' intent. *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54, ¶ 59, 420 P.3d 223, 235. "We ascertain the parties' intent 'primarily from the language of the instrument itself.'" *Id.* (quoting *Ad Two, Inc. v. City & Cty. of Denver*, 9 P.3d 373, 376 (Colo. 2000)).

¶13 In determining whether certain provisions of a contract are ambiguous, we focus on the words employed and construe any undefined words "in harmony with the[ir] plain and generally accepted meaning . . . and by reference to all the parts and provisions of the agreement and the nature of the transaction which forms its subject matter." *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). We may consult definitions in recognized dictionaries to give undefined words their plain and generally accepted meaning. *Renfandt v. N.Y. Life Ins. Co.*, 2018 CO 49, ¶ 18, 419 P.3d 576, 580.

¶14 If the contract is complete and free from ambiguity, we deem it to represent the parties' intent and enforce it based on the plain and generally accepted meaning of the words used. *Rocky Mountain*, ¶ 59, 420 P.3d at 235. But "if it is fairly susceptible to more than one interpretation," the contract is ambiguous and "the meaning of its terms is generally an issue of fact to be determined in the same manner as other disputed factual issues." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 912 (Colo. 1996) (quoting *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo. 1990) and *Union Rural Elec. Ass'n v. Public Utils. Comm'n*, 661 P.2d 247, 251 n.5 (Colo. 1983)).

## C. Relevant Contract Provisions and *Denver Firefighters*

¶15 Article 2-7 of the CBAs recognizes that the District has the "authority to establish policies and regulations for the management of all the operations and activities of the District." This acknowledgement is followed by a management rights clause: "All lawful rights and authority of the [District] not modified by [the CBAs] are retained by the [District]." The District places considerable stock in this clause.

¶16 We construed a management rights clause in a collective bargaining agreement in *Denver Firefighters*.[5] There, we explained that the management rights clause in the agreement between the City and the firefighters "illustrate[d] that the expansive rights retained by the City . . . [were] constrained only by express terms to the contrary." *Denver Firefighters*, ¶ 18, 320 P.3d at 360. Because the parties' agreement was "silent with regard to a specific management right"—the right to change the disciplinary system governing the firefighters—we had to "assume that the City ha[d] retained authority over that right." *Id.*

¶17 In stark contrast, here, the CBAs contain provisions that are fairly susceptible to being interpreted as expressly depriving the District of authority over compensation for

---

[5] The management rights clause in that case read as follows:

> Except as otherwise specifically provided in this Agreement, the City has the sole and exclusive right to exercise all the rights or functions of management and the exercise of any such rights or functions shall not be subject to any grievance procedure, except as to resolution of whether or not a specific matter is a management right.

*Denver Firefighters*, ¶ 18, 320 P.3d at 360.

ELA training. This is evident in Articles 32-1 and 32-3 of the CBAs. The former provides that "any time a teacher agrees to perform work for the District beyond the work week or [contract] year, that teacher *will be compensated* as described in this Article" (emphasis added).[6] The latter directly addresses compensation for "Extra Dut[ies]" undertaken by teachers outside the work week or contract year. Such extra duties include "Curriculum Development Assignments," "Summer School Teaching," "Senior High Stage Manager," and, of particular relevance here, "In-Service Education." For each extra duty, Article 32-3 establishes an hourly rate; for example, the hourly rate for "In-Service Education" is $21.57.

¶18 "In-Service Education" is not defined in the CBAs, but in the context pertinent here, the term is commonly understood to refer to "training and education given to employed teachers throughout their career." *In-service Education*, Collins English Dictionary, https://www.collinsdictionary.com/dictionary/english/in-service-education [https://perma.cc/M7WR-5T5U]. Even in contexts outside of teaching, the term has a similar definition. For instance, Mosby's Medical Dictionary defines "in[-]service education" as "a program of instruction or training provided by an agency or institution for its employees," which "is intended to increase the skills and competence

---

[6] Article 8-1 defines a teacher's "contract year" as "one hundred eighty-one (181) days." A teacher's "work week" is defined in Article 8-2 as "forty (40) hours." In amendments to the CBAs after this lawsuit was filed, the number of days in a contract year was increased to 184.

of the employees in a specific area." *Inservice Education*, The Free Dictionary, https://medical-dictionary.thefreedictionary.com/inservice+education [https://perma.cc/V46L-FLVN] (quoting Mosby's Medical Dictionary (9th ed. 2009)).

¶19 Giving effect to the plain and generally accepted meaning of the term "In-Service Education," Articles 32-1 and 32-3 are fairly susceptible to being interpreted as requiring compensation at an hourly rate of $21.57 for the extra duty of ELA training. ELA training can certainly be understood as training or education given to employed teachers. Further, ELA training may reasonably be deemed a program of instruction or training intended to increase the skills and competence of teachers who work with English language learners.[7] Thus, the trial court correctly ruled that the CBAs are ambiguous and that the jury should decide whether they require the District to compensate teachers for ELA training.[8]

¶20 The District cautions us that affirming the court of appeals will "discredit management rights clauses in collective bargaining agreements across the State" and will

---

[7] Recall that the District compensated its teachers for ELA training between the mid-1990s and 2008, which included the timeframe governed by the parties' 2005–08 CBA.

[8] The court of appeals upheld the trial court's judgment based on Article 32-1 of the CBAs. As we mentioned earlier, it determined that, "[b]ecause the [CBAs] provide for payment for work beyond the forty-hour week, and because the ELA training may fall into that category, the [CBAs are] fairly susceptible to being interpreted to require payment for such work." *Denver Classroom Teachers*, ¶ 17. We take a somewhat different path: in addition to relying on Article 32-1, we rely on Article 32-3, including its reference to "In-Service Education."

"eviscerate" our decision in *Denver Firefighters*. But nothing in this opinion can be read as gutting management rights clauses or undermining *Denver Firefighters*. Rather, *Denver Firefighters* is simply inapposite. Whereas the CBA in *Denver Firefighters* was silent on discipline, the CBAs here are not silent on compensation for training and education completed as an extra duty. To the contrary, they expressly require it, which means that the District does *not* retain the authority to decide whether to pay teachers for such training and education.

¶21 Where the District falters is in equating the CBAs' use of the broader term, "In-Service Education"—instead of the more specific term, "ELA training"—with the complete absence of express terms related to ELA training. The District's position is flawed for two reasons. First, the plain meaning of "In-Service Education" is fairly susceptible to being interpreted as encompassing ELA training. Consequently, the CBAs cannot reasonably be considered silent on ELA training.[9] Second, the District's construction could deny teachers payment for *any* "In-Service Education" simply because the training or education program attended is not specifically identified in the CBAs.[10] Payment for any such program, the District could argue, is not required because there is

---

[9] We disagree with the court of appeals' observation that the CBAs "are silent on whether work beyond" the set number of weekly or yearly hours "includes [ELA] training," *Denver Classroom Teachers*, ¶ 16. Work beyond the forty-hour week or contract year clearly includes "In-Service Education," and, as we have now determined, "In-Service Education" can be reasonably understood to encompass ELA training.

[10] The CBAs do not refer to any "In-Service Education" programs specifically; they simply refer to "In-Service Education."

no express term in the CBAs related to compensation for attending that specific program. In our view, the management rights net cannot be cast so broadly that it renders void or meaningless the express provision requiring the District to pay teachers for any "In-Service Education" completed.

¶22 Given that "In-Service Education" is fairly susceptible to being interpreted to include ELA training, and given further that the District does not retain the authority to determine whether to pay teachers for "In-Service Education," the District's reliance on the management rights clause is misplaced. The court of appeals correctly ruled that the interpretation of the CBAs was a factual question that the trial court aptly submitted to the jury.

### III. Conclusion

¶23 We conclude that the court of appeals correctly decided that it was proper to submit the interpretation of the CBAs as an issue of fact to the jury because the CBAs are ambiguous regarding payment for ELA training. Therefore, we affirm the judgment of the court of appeals, albeit on slightly different grounds.