Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 11, 2018

**2018 CO 54**

**No. 16SC305, <u>Rocky Mountain Exploration, Inc. and RMEI Bakken Joint Venture Group v. Davis Graham & Stubbs LLP and Gregory Danielson</u>—Undisclosed Principals—Fraud—Breach of Fiduciary Duty—Restatement (Third) of Agency.**

This case arises out of a sale of oil and gas assets by petitioners to a buyer who was acting as an agent for a third company. The third company was represented by respondents, but due to a prior, contentious business relationship between petitioners and the third company, neither the buyer, the third company, nor respondents disclosed to petitioners that the buyer was acting on behalf of the third company in the sale.

After the sale was complete, petitioners learned of the third company's involvement and sued respondents, among others, for breach of fiduciary duty, fraud, and civil conspiracy. The district court ultimately granted summary judgment for respondents, and a division of the court of appeals affirmed.

The supreme court must now decide whether (1) petitioners can avoid their sale agreement for fraud when the buyer and respondents purportedly created the false

impression that the buyer was not acting on behalf of the third company; (2) an assignment clause in the transaction documents sufficiently notified petitioners that the buyer was acting on behalf of others, such that the third company would not be considered an undisclosed principal under the Restatement provision on which petitioners' contract avoidance argument is exclusively premised; (3) petitioners stated a viable claim for fraud against respondents; and (4) prior agreements between petitioners and the third company negated any joint venture relationship or fiduciary obligations between them.

The court first concludes that the assignment clause in the pertinent transaction documents made clear that the buyer had partners in the transaction to whom it could assign a portion of its interests. As a result, the third company was not an undisclosed principal under the Restatement provision on which petitioners' rely, and petitioners' contract avoidance argument and the civil conspiracy claim that flows from it fail as a matter of law. The court further concludes that, even if the Restatement provision did apply, the record does not support a finding that either the buyer or respondents created a false impression that the buyer was not acting on behalf of an undisclosed principal. For this reason as well, petitioners' civil conspiracy claim fails as a matter of law.

The court next concludes that, as a matter of law, petitioners did not demonstrate the requisite false representation or reasonable reliance to support a viable claim for fraud against respondents.

Finally, the court concludes that the controlling agreements between petitioners and the third company expressly disavowed any pre-existing joint ventures and fiduciary obligations between the parties, and therefore the district court properly granted summary judgment for respondents on petitioners' claim for aiding and abetting a breach of fiduciary duty.

Accordingly, the supreme court affirms the court of appeals division's judgment.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2018 CO 54

## Supreme Court Case No. 16SC305
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case Nos. 14CA1483 & 15CA216

### Petitioners:

Rocky Mountain Exploration, Inc. and RMEI Bakken Joint Venture Group,

v.

### Respondents:

Davis Graham & Stubbs LLP and Gregory Danielson.

## Judgment Affirmed
*en banc*
June 11, 2018

**Attorneys for Petitioners:**
German May PC
William D. Beil
Phillip G. Greenfield
  *Kansas City, Missouri*

The Viorst Law Offices
Anthony J. Viorst
  *Denver, Colorado*

**Attorneys for Respondents:**
Connelly Law LLC
Sean Connelly
  *Denver, Colorado*

Lewis Roca Rothgerber Christie LLP
Gregory B. Kanan
Frederick J. Baumann

Tamara F. Goodlette
  *Denver, Colorado*

**Attorneys for Amicus Curiae Attorneys' Liability Assurance Society, Inc.:**
Snell & Wilmer L.L.P.
James D. Kilroy
  *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE MÁRQUEZ** dissents, and **JUSTICE COATS** joins in the dissent.
**JUSTICE HART** does not participate.

¶1     This case arises out of a series of transactions in which petitioners Rocky Mountain Exploration, Inc. and RMEI Bakken Joint Venture Group (collectively, "RMEI") sold oil and gas assets to Lario Oil and Gas Company ("Lario"). In that transaction, Lario was acting as an agent for Tracker Resource Exploration ND, LLC and its affiliated entities (collectively, "Tracker"), which were represented by respondents Davis Graham & Stubbs LLP and Gregory Danielson (collectively, "DG&S").

¶2     Prior to RMEI's sale to Lario, RMEI and Tracker had a business relationship related to the oil and gas assets that were ultimately the subject of the RMEI-Lario transaction. The RMEI-Tracker relationship soured after Tracker unsuccessfully sought to buy out RMEI's interests at a price that RMEI deemed too low.

¶3     Thereafter, Tracker and Lario reached an understanding by which Lario would seek to purchase RMEI's interests and then assign a majority of those interests to Tracker. Recognizing the history between Tracker and RMEI, however, Tracker and Lario agreed not to disclose Tracker's involvement in the deal.

¶4     DG&S represented Tracker throughout RMEI's sale to Lario. In that capacity, DG&S drafted the final agreement between RMEI and Lario, worked with the escrow agent, and hosted the closing at its offices. No party disclosed to RMEI, however, that DG&S was representing Tracker, not Lario.

¶5     After the sale from RMEI to Lario was finalized, Lario assigned a portion of the assets acquired to Tracker, and Tracker subsequently re-sold its purchased interests for a substantial profit. RMEI then learned of Tracker's involvement in its sale to Lario and

sued Tracker, Lario, and DG&S for breach of fiduciary duty, fraud, and civil conspiracy, among other claims. As pertinent here, the fiduciary breach claims were based on RMEI's prior relationship with Tracker. The remaining claims were based on allegations that Tracker, Lario, and DG&S misrepresented Tracker's involvement in the Lario deal, knowing that RMEI would not have dealt with Tracker because of the parties' strained relationship. Based on these claims, RMEI sought to avoid its contract with Lario.

¶6 Lario and Tracker eventually settled their claims with RMEI, and DG&S moved for summary judgment as to all of RMEI's claims against it. In this motion, DG&S argued (1) prior agreements between Tracker and RMEI expressly disavowed any fiduciary duties between the two companies, (2) RMEI could not establish that it reasonably relied on the alleged misrepresentations, and (3) DG&S did not owe RMEI a duty to disclose that it represented Tracker.

¶7 The district court granted DG&S's motion, and in a unanimous, published opinion, a division of the court of appeals affirmed. Rocky Mountain Expl., Inc. v. Davis Graham & Stubbs LLP, 2016 COA 33, ___ P.3d ___. RMEI then sought, and we granted, certiorari to consider whether (1) Lario and DG&S created the false impression that Lario was not acting for an undisclosed principal (i.e., Tracker) with whom Lario and DG&S knew RMEI would not deal; (2) an assignment clause in the RMEI-Lario transaction agreements sufficiently notified RMEI that Lario acted on behalf of an undisclosed principal; (3) prior agreements between RMEI and Tracker negated all previous joint ventures and any fiduciary obligations between them; (4) RMEI stated a

4

viable claim against DG&S for fraud based on affirmative misrepresentations; and

(5) RMEI can avoid the Lario sale based on statements allegedly made after RMEI and

Lario signed the sale agreement but prior to closing.[1]

¶8     We now affirm the division's ruling.  Addressing the first and second certiorari

questions together, we conclude that the assignment clause in the RMEI-Lario

transaction agreements made clear to RMEI that Lario had partners in the transaction to

whom Lario could assign a portion of its interests.  As a result, Tracker was not an

undisclosed principal under the Restatement provision on which RMEI's contract

avoidance argument is exclusively premised, and that argument and the civil

conspiracy claim against DG&S that flowed from it fail as a matter of law.  Even if the

---

[1] Specifically, we granted certiorari to review the following issues:

1.  Whether a seller may avoid a contract for fraud when any combination of words, conduct, and omissions by the buyer and the buyer's purported attorney intentionally creates the false impression that the buyer is not acting for an undisclosed principal with whom the buyer and attorney know the seller would not deal.

2.  Whether the buyer's assignment clause notifies a seller, as a matter of law, that the buyer is acting for an undisclosed principal.

3.  Whether, where a form agreement commonly used in oil and gas well-drilling operations disclaims a partnership among the well's investors and operator, that form, as a matter of law, negates every other pre-existing joint venture among the parties.

4.  Whether the seller stated affirmative misrepresentation claims against a law firm for falsely acting as if it represented the buyer when the law firm actually represented the buyer's undisclosed principal with whom the seller would not deal.

5.  Whether a party can avoid a contract based on fraud occurring after the contract has been executed but before it has closed.

5

Restatement provision applied, however, the record does not support the requisite finding that either Lario or DG&S, as its purported attorney, created a false impression that Lario was not acting on behalf of an undisclosed principal. For this reason as well, the civil conspiracy claim against DG&S, which is premised on the allegation that Lario was a fraudulent strawman purchaser, fails as a matter of law, and in light of this disposition, we need not address the fifth certiorari question.

¶9 Turning then to the fourth certiorari question, we conclude that, as a matter of law, RMEI did not demonstrate the requisite false representation or reasonable reliance to support a viable fraud claim against DG&S.

¶10 Finally, addressing the third certiorari question, we conclude that the controlling agreements between RMEI and Tracker expressly disavowed any pre-existing joint ventures and any fiduciary obligations between the parties. Accordingly, the district court properly granted summary judgment on RMEI's claim against DG&S for aiding and abetting a purported breach of fiduciary duty by Tracker.

## I. Facts and Procedural History

¶11 In 2006, RMEI and Tracker signed a purchase and sale letter agreement (the "Tracker Purchase Agreement") under which RMEI agreed to sell to Tracker an undivided eighty percent of its oil and gas interests in certain oil and gas leaseholds in North Dakota. Pursuant to that Agreement, the parties entered into an area of mutual interest that surrounded and included certain of the leases that RMEI already owned. The Tracker Purchase Agreement contemplated that Tracker and RMEI would jointly

acquire more oil leases within the area of mutual interest, on an undivided eighty/twenty profit-and-loss basis.

¶12 Over the succeeding two years, RMEI and Tracker entered into a model form of operating agreement (the "Tracker Operating Agreement") and a participation agreement (the "Tracker Participation Agreement"). The purpose of the latter was "to provide for [the parties'] participation in the development of the Subject Lands and the [area of mutual interest]." As pertinent here, the Tracker Participation Agreement provided that "[it] and the [Tracker Operating Agreement] contain the entire agreement between the Parties concerning the subject matter referred to herein and they shall supersede and replace any prior agreements between the Parties concerning such subject matter." In addition, the Tracker Operating Agreement contained a provision disclaiming any joint venture or fiduciary relationship between RMEI and Tracker:

> It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relation with each other under this agreement, the parties shall not be considered fiduciaries or to have established a confidential relationship but rather shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

¶13 After proceeding under the foregoing agreements for a period of time, the relationship between Tracker and RMEI deteriorated. Tracker offered to buy out RMEI's remaining twenty percent interest in the leases, but RMEI declined Tracker's offer as too low. Thereafter, the parties' relationship continued to decline as a result of

disagreements concerning the leases, with Tracker claiming that RMEI had breached the Tracker Operating Agreement and RMEI denying that allegation.

¶14 Eventually, RMEI engaged a broker to find a third-party purchaser for RMEI's interest. RMEI asserts that it did so because of its soured relationship with Tracker.

¶15 Lario subsequently learned both that RMEI's interest was for sale and that Tracker had sought to purchase this interest but was unable to do so as a result of animosity between the two companies. Perceiving an opportunity, Lario spoke with Tracker about jointly bidding on RMEI's interest, with Lario receiving twenty-five percent of the leasehold interests acquired in the sale. Tracker was amenable to such an arrangement, and it and Lario agreed to have Lario pursue a deal with RMEI. Tracker and Lario further agreed that they would not disclose Tracker's involvement to RMEI, recognizing that the issues between RMEI and Tracker might make a deal impossible if RMEI knew of Tracker's involvement. Tracker and Lario's agreement effectively established Lario as Tracker's agent in the transaction.

¶16 Lario then requested RMEI's permission to use DG&S as its attorney on the deal. Lario stated that DG&S's knowledge of RMEI's assets, which knowledge was based on DG&S's prior representation of Tracker, would facilitate the transaction. Although RMEI's president agreed to allow such representation, DG&S subsequently determined that its ongoing representation of Tracker created a conflict of interest that prevented it from representing Lario in the proposed transaction. Accordingly, DG&S would only represent Tracker in the deal.

8

¶17     Ultimately, RMEI and Lario signed a letter of intent for RMEI to sell its interest to Lario (the "Lario Letter of Intent"). Tracker and Lario then signed their own letter of intent (the "Tracker Letter of Intent"), under which Lario agreed to assign to Tracker seventy-five percent of Lario's interest in the Lario Letter of Intent. Several weeks later, RMEI and Lario signed an asset purchase and sale agreement (the "Lario Purchase and Sale Agreement"), under which Lario purchased RMEI's interest in the oil and gas leaseholds at issue.

¶18     Notably, in its capacity as counsel for Tracker (whose interests Lario was representing in the RMEI-Lario transaction), DG&S drafted many of the pertinent documents in that transaction, communicated with RMEI's bank, and facilitated the creation of an escrow account. In addition, when preparing deal documents, DG&S scrubbed the metadata from anything coming from Tracker to prevent RMEI from learning of Tracker's involvement, which Tracker feared could threaten the deal.

¶19     After RMEI and Lario had signed the Lario Purchase and Sale Agreement but before the sale had closed, Lario's president emailed RMEI's president, stating, among other things, "[O]ur attorney is preparing the partial Lien [sic] release for Citizen's Bank to execute." DG&S received a copy of this email and later sent the lien release to RMEI's president, but it did not correct Lario's assertion that its attorney would be sending the document. Similarly, in a subsequent email that Lario sent and on which RMEI's president was copied, Lario again referred to DG&S as its law firm. And RMEI's president referred to DG&S as Lario's counsel in two subsequent emails that

9

DG&S received. Again, DG&S did not correct RMEI's apparent misunderstanding that DG&S was Lario's counsel.

¶20 Both the RMEI-Lario transaction and the Tracker-Lario transaction closed, with the closings taking place on the same day and in DG&S's offices, albeit in separate conference rooms. Thereafter, Tracker sold all of its interests in the North Dakota leaseholds at issue and received a substantial price premium.

¶21 RMEI then learned of Tracker's involvement in the RMEI-Lario transaction, and in a 53-page, 225-paragraph complaint asserting eighteen separate claims, it proceeded to sue Tracker, Lario, certain of their officers, and DG&S. As pertinent here, RMEI alleged that DG&S (1) engaged in a civil conspiracy to misappropriate RMEI's interests in the leaseholds at issue by setting up Lario as a strawman purchaser; (2) aided and abetted Tracker's breach of its fiduciary duty to RMEI; (3) committed fraud; (4) engaged in a civil conspiracy to commit fraud; and (5) aided and abetted fraud.

¶22 Ultimately, all of the defendants except DG&S either settled their claims with RMEI or had their claims dismissed. DG&S, however, moved for summary judgment, asserting, as pertinent here, that RMEI could not establish the requisite justifiable reliance on the alleged misrepresentations because the RMEI-Lario transaction documents made clear that Lario had unnamed partners and investors and that Lario could sell the assets purchased. DG&S further argued that RMEI could not establish that DG&S owed RMEI a duty to disclose that it represented Tracker. Finally, DG&S asserted that RMEI could not establish that Tracker owed a fiduciary duty to RMEI because the Tracker Operating Agreement negated any fiduciary relationship between

10

the parties. Therefore, RMEI's claim against DG&S for aiding and abetting a breach of such a fiduciary duty could not survive.

¶23 The district court granted DG&S's motion, agreeing that as a matter of law, RMEI could not establish either a duty by DG&S to disclose that it represented Tracker or a fiduciary duty owed by Tracker to RMEI, which RMEI had to establish to support its claim against DG&S for aiding and abetting a breach of such a duty. The district court also concluded that the use of a strawman purchaser was not fraud, citing, among other authorities, the Restatement (Third) of Agency (Am. Law Inst. 2006).

¶24 RMEI appealed, arguing that the district court erred in granting summary judgment on RMEI's fraud and breach of fiduciary duty claims. The division, however, affirmed the district court's grant of summary judgment in favor of DG&S. Rocky Mountain, ¶ 68. As pertinent here, the division observed that under the Restatement (Third) of Agency, a contracting party may not avoid a contract entered into by an agent acting for an undisclosed principal unless (1) the agent falsely represented that it did not act on behalf of a principal and (2) the principal or agent had notice that the third party would not have dealt with the principal. Id. at ¶ 23. The division concluded that the foregoing prerequisites for avoiding a contract either did not apply or were not satisfied because (1) the agreements between RMEI and Lario gave RMEI notice that Lario was acting as agent for a principal and thus Tracker was an unidentified but not an undisclosed principal and (2) Lario did not falsely represent that it did not act on behalf of a principal. Id. at ¶¶ 29–34. The division thus concluded that RMEI did not establish the existence of a disputed material fact as to the applicability of the pertinent

11

section of the Restatement.  <u>Id.</u> at ¶¶ 27–34.  In addition, the division concluded that the district court had correctly determined that Tracker owed no fiduciary duty to RMEI because the agreements between RMEI and Tracker had expressly disclaimed the existence of a joint venture or fiduciary relationship.  <u>Id.</u> at ¶ 51.  Finally, the division concluded that the district court had properly construed RMEI's fraud claims as claims for fraudulent nondisclosure and therefore RMEI could not prevail unless it demonstrated that DG&S had a duty to disclose Tracker's involvement in the RMEI-Lario transaction, which it could not do.  <u>Id.</u> at ¶¶ 60–63.

¶25     RMEI petitioned this court for certiorari review, and we granted that petition.

## II. Analysis

¶26     We begin by setting forth the applicable standard of review.  We then address together the first two questions on which we granted certiorari and conclude that RMEI's civil conspiracy claim against DG&S, which was premised on RMEI's assertion that Lario was a fraudulent strawman purchaser, fails as a matter of law.  We then proceed to discuss the fourth question on which we granted certiorari, and we conclude, as a matter of law, that RMEI did not demonstrate the requisite justifiable reliance to support its claim against DG&S for fraud based on affirmative misrepresentations.  Finally, we address RMEI's claim against DG&S for aiding and abetting Tracker's alleged breach of fiduciary duty, and we conclude that because the Tracker Operating Agreement expressly disavowed any fiduciary obligations between RMEI and Tracker, RMEI's aiding and abetting claim is not viable as a matter of law.

12

## A. Standard of Review

¶27 We review a grant of summary judgment de novo. Hardegger v. Clark, 2017 CO 96, ¶ 13, 403 P.3d 176, 180. When, as here, the material facts are undisputed, summary judgment is proper only when the pleadings and supporting documents show that the moving party is entitled to judgment as a matter of law. Id.; accord C.R.C.P. 56(c). In determining whether summary judgment is proper, a court grants the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolves all doubts against the moving party. Hardegger, ¶ 13, 403 P.3d at 180. In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on mere allegations or demands in its pleadings but must provide specific facts demonstrating a genuine issue for trial. Id.

## B. RMEI's Request to Avoid the Lario Sale

¶28 We first consider the two certiorari questions related to RMEI's assertion that the Restatement (Third) of Agency permits it to avoid the sale to Lario because Lario gave the impression that DG&S was representing it in the sale. We begin with the principles of agency law that the parties agree apply here, and we then apply those principles to the facts presented.

### 1. Restatement (Third) of Agency

¶29 All of the parties before us agree that the principles set forth in the Restatement (Third) of Agency apply here.

¶30 Section 1.04(2) of the Restatement (Third) of Agency defines three types of principals on whose behalf an agent can act: disclosed, undisclosed, and unidentified.

A principal is disclosed if a third party has notice that the agent with whom it is interacting is acting for a principal and if the third party has notice of the principal's identity. Id. A principal is undisclosed if the third party has no notice that the agent is acting for a principal. Id. A principal is unidentified if the third party has notice that the agent is acting for a principal but does not have notice of the principal's identity. Id. "A person has notice of a fact if the person knows the fact, has reason to know the fact, has received an effective notification of the fact, or should know the fact to fulfill a duty owed to another person." Id. at § 1.04(4).

¶31 Agents regularly act on behalf of undisclosed and unidentified principals when entering into contracts. See, e.g., Sigel-Campion Live Stock Comm'n Co. v. Davis, 194 P. 468, 470 (Colo. 1921) (concluding that an undisclosed principal "could take the benefit of the offer and of the contract"); Filho v. Rodriguez, 36 P.3d 199, 200 (Colo. App. 2001) (concluding that an unidentified principal could enforce a contract, unless the principal's existence was fraudulently concealed); Kelly Asphalt Block Co. v. Barber Asphalt Paving Co., 105 N.E. 88, 89 (N.Y. 1914) ("The general rule is not disputed. A contract not under seal, made in the name of an agent as ostensible principal, may be sued on by the real principal at the latter's election."); Restatement (Third) of Agency § 6.03 ("When an agent acting with actual authority makes a contract on behalf of an undisclosed principal, . . . unless excluded by the contract, the principal is a party to the contract."). Thus, acting on behalf of an undisclosed or unidentified principal, by itself, is not fraudulent. See Filho, 36 P.3d at 200.

14

¶32 Indeed, the Restatement has recognized the "practical importance" of undisclosed principals, noting that they can be useful in certain scenarios. See Restatement (Third) of Agency § 6.03 reporter's note b. For example, by acting as an undisclosed principal, a buyer interested in assembling a tract of land from multiple owners for a large-scale project can overcome the potential problem of hold-out owners who, once the buyer's interest becomes known, may exploit the buyer's vulnerability by demanding prices well in excess of current market value. Id.; see also Makowski v. Mayor & City Council of Baltimore, 94 A.3d 91, 105 n.22 (Md. 2014) ("Private developers often avoid the 'hold-out' problem by utilizing 'buying agents' to conceal the fact that they are seeking to acquire multiple properties to avoid paying a higher price.").

¶33 Notwithstanding these general principles allowing for the involvement of undisclosed principals, the parties here agree that when an agent for an undisclosed principal enters into a contract, the other party to that contract may avoid the contract if (1) the agent falsely represents to the third party that the agent does not act on behalf of a principal and (2) the principal or agent had notice that the third party would not have dealt with the principal. Restatement (Third) of Agency § 6.11(4); see also Hirsch v. Silberstein, 227 A.2d 638, 639 (Pa. 1967) (noting that the record may have indicated a representation by the agent that he was not acting on behalf of a principal but that it contained no evidence that the sellers would not have dealt with the principal had their

15

existence been known).[2]  Importantly, this rule does not apply to agents who act on behalf of unidentified, as opposed to undisclosed, principals.  See Restatement (Third) of Agency § 6.11(4) (stating the rule solely in terms of "an undisclosed principal"); see also Filho, 36 P.3d at 200 (noting the Restatement's distinction between undisclosed and disclosed or partially disclosed, i.e., unidentified, principals).

¶34    The purpose of the foregoing legal principles is straightforward: "[I]n most cases the principal's involvement is not material to the third party's decision-making" because (1) "most parties decide to commit themselves to transactions on the basis of the price and other substantive terms plus an assessment of the likelihood that the other parties will perform duties that the contract creates" and (2) "[a]n undisclosed principal's involvement ordinarily should not affect the price and other substantive terms of the contract."  Restatement (Third) of Agency § 6.11 cmt. d; see also Hirsch, 227 A.2d at 640 (noting that a seller ordinarily may not avoid an agreement based on the existence of an undisclosed principal because when parties deal at arms-length, the only important question is the price to be paid).  Accordingly, the principles articulated in the above-described authorities protect an unidentified or undisclosed principal from a third party who regrets the transaction after learning the purchaser's identity because such regret is often based on a belief that had the purchaser's identity been known, the

---

[2] We acknowledge that in its First Amended Complaint, RMEI did not directly seek to void its agreement with Lario for fraud.  RMEI, however, sought, and we granted, certiorari to decide whether RMEI could avoid its agreement with Lario for fraud under the circumstances presented here.  In any event, we perceive no basis for applying one set of principles when a party seeks to avoid a contract based on fraud and a different set of principles when that party effectively seeks the same result by way of a damages claim for fraud.  We do not understand the parties to argue otherwise.

16

seller would have demanded, and the buyer would have paid, a higher price. <u>See</u> Restatement (Third) of Agency § 6.11 cmt. d.

¶35 This is not to say, however, that a contracting party cannot protect itself if it wants assurance that no undisclosed principal (or particular unidentified principal) is involved in the transaction. A contracting party may insist that the contract provide that the named parties are the only parties with rights and liabilities under the contract. <u>Id.</u>; <u>see also</u> <u>Filho</u>, 36 P.3d at 200 (noting that a person who contracts with an agent acting with authority on behalf of a disclosed or partially disclosed principal is liable to the principal unless the principal is excluded from the contract); <u>Arnold's of Miss., Inc. v. Clancy</u>, 171 So. 2d 152, 154 (Miss. 1965) ("The rule allowing an undisclosed principal to sue on a contract made by his agent does not apply where the specific terms of the contract or the circumstances under which it is made, excludes liability to an undisclosed principal . . . ."). And, of course, the third party can simply ask the person with whom it is dealing whether that person is acting as an agent for an undisclosed or unidentified principal. <u>See</u> Restatement (Third) of Agency § 6.11 cmt. d.

## 2. Application

¶36 With these principles in mind, we turn to whether RMEI can avoid the Lario sale for fraud on the facts presented here. RMEI contends that under the Restatement, it is entitled to do so because Lario was an agent for an undisclosed principal (Tracker) and (1) Lario and DG&S (as its purported counsel) falsely represented to RMEI that Lario did not act on behalf of a principal and (2) Tracker, Lario, and DG&S knew that RMEI would not have dealt with Tracker. We are not persuaded.

17

¶37 As an initial matter, we note that the premise of RMEI's argument is flawed because as the division concluded, Tracker was not an undisclosed principal at all. Rather, based on the Lario Letter of Intent and the Lario Purchase and Sale Agreement, it was an unidentified principal. As a result, the Restatement does not provide a basis on which RMEI can avoid the Lario sale. See Restatement (Third) of Agency § 6.11(4).

¶38 The Lario Letter of Intent provided, "The Parties shall not disclose the existence of this Letter Agreement and its contents to any third party, except . . . to each Party's . . . investors (including Buyer's venture partners in this transaction) . . . directly and solely for the purpose of evaluating the proposed transaction." (Emphasis added.)

¶39 The Lario Letter of Intent further provided:

> Lario has other investors or partners who may elect to join in the acquisition of the Properties under the terms of this Letter Agreement. Lario shall have the right to assign a portion but not all of its interest in this Letter Agreement to such investors or partners. Lario agrees, and shall agree in the instrument conveying the Properties, that any subsequent assignment or transfer of the Properties, or any portion thereof, made by Lario, shall contain covenants and indemnifications similar to those contained in this agreement and Lario agrees that any such assignment or transfer will not relieve it of the obligations assumed herein.

(Emphases added.)

¶40 These provisions gave RMEI notice that Lario was acting on behalf of itself and unnamed third parties to whom Lario reserved the right to assign a portion of its interests in the acquired assets. And this is precisely the kind of agreement that Lario ultimately entered into with Tracker (i.e., an agreement to assign a portion of its interest).

18

¶41    Similarly, the confidentiality provision in the Lario Purchase and Sale Agreement permitted the parties to discuss the agreement with the parties' investors "including Buyer's potential partners in this transaction." And that agreement further provided:

> Assignment: . . . [Lario] shall have the right to assign a portion but not all of its interest in this Agreement to third parties who have agreed to participate in this transaction. [Lario] agrees, and shall agree in the instrument conveying the Assets, that any subsequent assignment or transfer of the Assets, or any portion thereof, made by [Lario], shall contain covenants and indemnifications similar to those contained in this Agreement and [Lario] agrees that any such assignment or transfer will not relieve it of the obligations assumed herein.

(Emphasis added.) Again, Lario's ultimate agreement with Tracker was fully consistent with this provision.

¶42    For these reasons, section 6.11(4) of the Restatement, on which RMEI's civil conspiracy claim against DG&S is based, does not apply because Tracker was an unidentified, rather than an undisclosed, principal.

¶43    In reaching this conclusion, we are not persuaded otherwise by RMEI's arguments that (1) the referenced clauses only placed it on notice that Lario could assign its interest, not that it was acting as an agent and (2) the language in the assignment clauses suggested that Lario might assign its interest in the future, not that it had already entered into an agreement to make the assignment.

¶44    We do not agree that the distinction between an assignee and a principal is pertinent in this context. Indeed, the Restatement recognizes the similarity between these two concepts, noting that the inclusion of a provision prohibiting the assignment of a contract can, at least in some instances, protect a third party from an undisclosed

principal. See Restatement (Third) of Agency § 6.11 cmt. d. Moreover, the provisions in the Lario Letter of Intent and the Lario Purchase and Sale Agreement provided RMEI with notice of the nature of Lario and Tracker's relationship, namely, that Lario was acting on behalf of unnamed partners to whom it could assign a portion of the interests it acquired. See Miller v. Willey, 521 S.W.2d 68, 69 (Ark. 1975) (concluding that the appellants could not avoid a contract involving an undisclosed principal because the contract stated that the appellants agreed to execute and deliver to the other contracting party, Willey, or "to any person or persons as [Willey] * * * shall direct in writing" a good and sufficient warranty deed and this contractual language put the appellants on notice that Willey was acting for a principal).

¶45 We also are unpersuaded that the above-referenced contract provisions did not sufficiently indicate the involvement of a third party because, according to RMEI, they only indicated that Lario may assign its interest in the future. As noted above, the provisions identifying the other investors/partners were framed in the present tense: "Lario has other investors or partners" and "third parties who have agreed to participate in this transaction." (Emphases added.) We therefore conclude that even if the provisions framed the assignment as occurring in the future, the provisions identifying the investors were sufficiently specific to provide effective notice that other unidentified parties were working with Lario on the sale.

¶46 Accordingly, we conclude that Tracker was an unidentified, rather than an undisclosed, principal for Lario, and therefore section 6.11(4) of the Restatement, on which RMEI's civil conspiracy claim against DG&S was based, does not apply.

20

¶47 Even assuming that Tracker was an undisclosed principal, however, the record does not support RMEI's assertion that Lario falsely represented to RMEI that Lario was not acting on behalf of a principal.

¶48 A "false representation" is defined as any words or conduct that creates an untrue or misleading impression of the actual past or present fact in the mind of another. Nelson v. Gas Research Inst., 121 P.3d 340, 343 (Colo. App. 2005); see also H.B. Bolas Enter., Inc. v. Zarlengo, 400 P.2d 447, 450 (Colo. 1965) ("Actionable deception may arise from circumstances and conduct as well as from words."). Whether circumstances, conduct, or words are the means allegedly used to deceive, however, the means used must be of a "definite and specific character" because a party has no right to rely on circumstances, conduct, or words that are equivocal, such that "they comport equally with innocence and good faith as with bad motivation." H.B. Bolas, 400 P.2d at 450.[3] Consistent with these principles, an agent does not "impliedly represent that the agent does not act on behalf of a principal" simply by not disclosing the principal's existence. See Restatement (Third) of Agency § 6.11(4) cmt. d.

¶49 Here, RMEI argues that Lario's suggestions that DG&S was Lario's attorney (and DG&S's not correcting such suggestions) amounted to false representations that Lario was acting alone in the transaction, rather than acting as an agent of another. We disagree. Even though Lario's president referred to DG&S as Lario's attorney, it does not follow that this statement amounted to a misrepresentation that Lario was not

---

[3] Absent such a requirement, a party could avoid summary judgment on a fraud claim merely be alleging that it was misled by vague or equivocal conduct, no matter how lawful or innocent.

21

acting as an agent for an undisclosed principal. An agent may have its own lawyer (or share a lawyer with its principal), while at the same time acting on behalf of an undisclosed principal.

¶50    For these reasons, we conclude that the combination of words and conduct by Lario (and, RMEI contends, DG&S, as Lario's purported counsel) were not of a sufficiently definite or specific character to constitute a false representation that Lario did not act on behalf of an undisclosed principal. <u>H.B. Bolas</u>, 400 P.2d at 450. Accordingly, even if Tracker were an undisclosed principal, the Restatement provision on which RMEI relies does not support its civil conspiracy claim against DG&S.

¶51    In light of the foregoing, we need not reach the fifth question on which we granted certiorari because even if RMEI could assert fraud claims based on conduct occurring after the Lario Purchase and Sale Agreement was signed but before the closing of that transaction, as a matter of law, those assertions would not support RMEI's effort to avoid the RMEI-Lario agreement, for the reasons discussed above.

### C. Fraud Claims Against DG&S

¶52    Having rejected RMEI's assertions that it was entitled to avoid its contract with Lario under the Restatement and that it therefore had a viable civil conspiracy claim against DG&S, we now turn to whether RMEI adduced sufficient evidence to support a viable claim against DG&S for fraud based on affirmative misrepresentations. RMEI argues that by pretending to represent Lario in the sale, DG&S engaged in affirmative conduct to mislead RMEI into believing that Lario acted alone in the transaction. Again, we are not persuaded.

22

¶53 To overcome a motion for summary judgment on its claim for fraud by affirmative misrepresentation (as opposed to concealment), RMEI was required to offer evidence that would allow a reasonable jury to conclude that (1) DG&S made a fraudulent misrepresentation of material fact; (2) RMEI relied on this misrepresentation; (3) RMEI had a right to rely on, or was justified in relying on, the misrepresentation; and (4) RMEI's reliance resulted in damages. M.D.C./Wood, Inc. v. Mortimer, 866 P.2d 1380, 1382 (Colo. 1994). A fact is material if a reasonable person under the circumstances would attach importance to it in determining his or her course of action. Denberg v. Loretto Heights Coll., 694 P.2d 375, 377 (Colo. App. 1984). A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation. See, e.g., Brush Creek Airport, L.L.C. v. Avion Park, L.L.C., 57 P.3d 738, 749 (Colo. App. 2002) (concluding that a party did not justifiably rely on a representation that an airport runway was 4700 feet long when the party had seen or obtained documents showing a 4000-foot runway).

¶54 Here, RMEI asserts that DG&S affirmatively misrepresented that it was acting solely on Lario's behalf by (1) drafting the Lario Purchase and Sale Agreement and other documents related to that transaction; (2) working with the escrow agent on the transaction; (3) hosting the closing at its offices and preparing the final closing documents; and (4) knowing of but failing to correct Lario's references to DG&S as its lawyer. For several reasons, we are not persuaded.

¶55 First, we perceive nothing in the above-referenced conduct that is of such a definite and specific character so as to indicate unequivocally that (1) Lario was acting

23

alone in the transaction, (2) DG&S was not representing Tracker (or another undisclosed or unidentified principal), or (3) Tracker was not involved with the deal. This is particularly true here, where, as noted above, the Lario Letter of Intent and the Lario Purchase and Sale Agreement sufficiently advised RMEI that Lario had unnamed partners in the transaction. Accordingly, any reliance by RMEI on DG&S actions purportedly suggesting that Lario was acting alone was unjustifiable. See id.

¶56 Second, as both the district court and the division below concluded, the actions on which RMEI relies amounted, at best, to a claim that DG&S fraudulently concealed Tracker's involvement from RMEI. To establish a claim for fraudulent concealment, however, a plaintiff must prove (1) the concealment of a material existing fact that in equity and good conscience the defendant should have disclosed; (2) knowledge on the defendant's part that such a fact was being concealed; (3) ignorance of that fact on the plaintiff's part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. BP Am. Prod. Co. v. Patterson, 263 P.3d 103, 109 (Colo. 2011). To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must thus show that the defendant had a duty to disclose the material information. Mallon Oil Co. v. Bowen/Edwards Assoc., Inc., 965 P.2d 105, 111 (Colo. 1998).

¶57 Here, RMEI has not asserted, nor could it assert, that DG&S owed it a duty to disclose Tracker's existence. Indeed, were we to impose such a duty on DG&S here, parties would no longer be permitted to conduct transactions involving undisclosed principals. Such a ruling, however, would undermine a century of established

24

Colorado law. See, e.g., Sigel-Campion Live Stock, 194 P. at 470. It would also interfere with attorneys' well-settled duties of loyalty and confidentiality to their clients in situations like that present here. We perceive no basis for doing either in this case.

## D. Fiduciary Duty Claims

¶58 Finally, we turn to RMEI's claim that DG&S aided and abetted a breach of fiduciary duty allegedly owed by Tracker to RMEI. RMEI asserts that Tracker owed it a fiduciary duty to disclose its involvement in the transaction at issue because the Tracker Purchase Agreement created a joint venture between the two parties. RMEI further asserts that DG&S aided and abetted Tracker in breaching this duty. We do not agree.

¶59 Well-established principles of contract law guide our review, with our primary goal being to determine and give effect to the intent of the parties. Ad Two, Inc. v. City & Cty. of Denver, 9 P.3d 373, 376 (Colo. 2000). We ascertain the parties' intent "primarily from the language of the instrument itself." Id. In ascertaining whether certain provisions of an agreement are ambiguous, we examine the instrument's language and construe that language in harmony with the plain and generally accepted meaning of the words employed. Id. When the written contract is complete and free from ambiguity, we will deem it to express the intention of the parties and enforce it according to its plain language. Id.

¶60 A claim for breach of fiduciary duty is a tort aimed at remedying economic harm suffered by one party due to a breach of duties owed in a fiduciary relationship. Accident & Injury Med. Specialists, P.C. v. Mintz, 2012 CO 50, ¶ 21, 279 P.3d 658, 663. A fiduciary relationship exists between two persons when one is under a duty to act or

give advice for the benefit of the other on matters within the scope of the relationship. Id.

¶61 This court has recognized certain fiduciary relationships as a matter of law, including the relationships between an attorney and a client and between a trustee and a trust beneficiary. Id. at ¶ 42, 279 P.3d at 663. This court has also recognized a fiduciary relationship as a matter of law when one party occupies a superior position relative to another and assumes a duty to act in the dependent party's best interest. Id. And we have recognized the fiduciary nature of the relationship that exists between the parties to a joint venture. See Lucas v. Abbott, 601 P.2d 1376, 1379 (Colo. 1979).

¶62 Even when a fiduciary relationship exists, however, the parties to that relationship may modify — or even disclaim — that relationship. See Dime Box Petroleum Corp. v. La. Land & Expl. Co., 938 F.2d 1144, 1147–48 (10th Cir. 1991) (noting that joint venturers owed fiduciary duties to one another unless their contract modified that obligation); see also Mandelbaum v. Fiserv, Inc., 787 F. Supp. 2d 1226, 1241 (D. Colo. 2011) (concluding that the plaintiff's breach of fiduciary duty claims failed as a matter of law because the parties' agreements "exculpate[d] Defendants of any such duties."); Asian Vegetable Research & Dev. Ctr. v. Inst. of Int'l Educ., 944 F. Supp. 1169, 1178 (S.D.N.Y. 1996) (concluding that as a matter of law, no fiduciary relationship existed between the parties because the contract between them "clearly and unambiguously disclaim[ed] a fiduciary relationship.").

¶63 Here, as noted above, the Tracker Participation Agreement provided that it and the Tracker Operating Agreement contained the entire agreement between RMEI and

26

Tracker <u>and superseded any prior agreements</u>.  The Tracker Operating Agreement, in turn, expressly disclaimed both the creation of a joint venture and any fiduciary relationship:

> <u>It is not the intention of the parties to create, nor shall this agreement be construed as creating</u>, a mining or other partnership, <u>joint venture</u>, agency relationship or association, or to render the parties liable as partners, <u>co-venturers</u>, or principals.  <u>In their relations with each other under this agreement, the parties shall not be considered fiduciaries</u> or to have established a confidential relationship but otherwise shall be free to act on an arm's-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder.

(Emphases added.)

¶64    In our view, this language is clear and unambiguous and expressly disclaims any fiduciary relationship that otherwise may have existed between Tracker and RMEI. Tracker therefore did not owe RMEI any fiduciary obligations, and as a matter of law, RMEI cannot assert a viable claim against DG&S for aiding and abetting a breach of such nonexistent obligations.

¶65    We are not persuaded otherwise by RMEI's contentions that (1) the disclaimer in the Tracker Operating Agreement applied only to well operations, not to the sale of leases and (2) as a result, the sale to Lario was governed only by the Tracker Purchase Agreement and Tracker Participation Agreement, which did not disclaim a fiduciary relationship between the parties.

¶66    As noted above, the Tracker Participation Agreement made clear that it and the Tracker Operating Agreement constituted the entire agreement between the parties concerning the subject matter contained in the Tracker Participation Agreement.  As a

27

result, RMEI's reliance on the Tracker Purchase Agreement is misplaced. Moreover, notwithstanding RMEI's assertions to the contrary, the Tracker Operating Agreement addresses nearly all aspects of the parties' relationship, including the surrender, renewal, extension, and assignment of leases. Accordingly, we conclude that under the plain language of the operative agreements between RMEI and Tracker, the parties disclaimed any fiduciary obligations to one another, and therefore, RMEI's purported claim against DG&S for aiding and abetting an alleged breach of such fiduciary obligations fails as a matter of law.

### III. Conclusion

¶67 For these reasons, we conclude that the district court properly granted summary judgment on all of the claims asserted against DG&S by RMEI. Accordingly, we affirm the division's judgment.

**JUSTICE MÁRQUEZ** dissents and **JUSTICE COATS** joins in the dissent.
**JUSTICE HART** does not participate.

JUSTICE MÁRQUEZ, dissenting.

I respectfully dissent. First, I am unconvinced that section 6.11(4) of the Restatement (Third) of Agency has any bearing on the claims at issue in this case. Even if it does, I disagree with the majority's conclusion that the assignment clauses in the transaction agreements between Rocky Mountain Exploration, Inc. ("RMEI") and Lario Oil and Gas Company ("Lario") were sufficient, as a matter of law, to disclose to RMEI that Lario was acting as an agent (and thus, that Tracker Resource Exploration ND, LLC ("Tracker") was merely an "unidentified," rather than an "undisclosed," principal for purposes of section 6.11(4)). Next, I disagree with the majority's "definite and specific character" requirement for false representations, and the majority's application of this (new) requirement in its discussion of section 6.11(4) and its analysis of RMEI's claims against Davis Graham & Stubbs LLP ("DG&S") for fraudulent misrepresentation. And finally, because I believe the majority misreads the 2007 Operating Agreement, I disagree with the majority's resolution of RMEI's claim that DG&S aided and abetted a breach of fiduciary duty owed by Tracker.

## I.

The majority notes that "[a]ll parties before us agree that the principles set forth in the Restatement (Third) of Agency apply" to this case, maj. op. ¶ 29, and asserts that RMEI's civil conspiracy claim was "based [on]" section 6.11(4) of the Restatement, id. at ¶ 46. Yet it is not clear to me why this is so.

Section 6.11 of the Restatement concerns "circumstances under which representations made by an agent affect a principal's legal position in actions brought to

1

enforce or rescind a contract." Restatement (Third) of Agency § 6.11 cmt. a (Am. Law Inst. 2006) (emphasis added); see also id. § 6.11(4) (providing that a third party "may avoid the contract" if an agent who makes a contract on behalf of an undisclosed principal "falsely represents to the third party that the agent does not act on behalf of a principal" and "the principal or agent had notice that the third party would not have dealt with the principal." (emphasis added)).

¶71 The problem is that this case is not an "action[ ] brought to enforce or rescind a contract." Rather, the claims at issue here are for breach of fiduciary duty, fraud, and civil conspiracy, and RMEI's First Amended Consolidated Complaint for Damages and Jury Demand ("Amended Complaint") seeks only damages with respect to these claims. Am. Compl. ¶¶ 154 (Count III, Civil Conspiracy), 158 (Count IV, Aiding and Abetting Breach of Fiduciary Duty), 219 (Count XVI, Fraud), 221 (Count XVII, Conspiracy to Commit Fraud), 225 (Count XVIII, Aiding and Abetting Fraud). Indeed, although the majority discusses section 6.11(4) to analyze "whether RMEI can avoid the Lario sale" maj. op. ¶ 36 (emphasis added), RMEI's Amended Complaint does not seek to avoid the sale of its oil and gas assets to Lario.[1] In fact, Lario is not named as a defendant in the

---

[1] Neither the amended complaint nor the parties' summary judgment briefing below mentions section 6.11. The district court referred to section 6.03 of the Restatement in its order granting summary judgment, noting that as a general rule, an agent's failure to disclose the existence or identity of a principal is not actionable conduct. Then, in its opening brief before the court of appeals, RMEI contended—in a footnote—that the trial court's analysis had ignored section 6.11(4). DG&S responded that this issue was unpreserved, but addressed it on the merits anyway. RMEI continued to argue the issue in its reply, and the court of appeals discussed section 6.11(4) at length in its opinion. As a result, section 6.11(4) of the Restatement has now become a central focus of this appeal.

2

Amended Complaint because the Lario/RMEI agreement contained an arbitration clause. In other words, not only did RMEI not seek to avoid the sale to Lario, it could not have sought such a remedy in its claim against DG&S, which was not a party to the Lario/RMEI agreement. In any event, it is unclear to me why avoidance of the contract would be relevant or necessary to prove RMEI's civil conspiracy claim against DG&S. See id. at ¶ 52.[2] I therefore do not believe section 6.11(4) has any bearing on the claims at issue here.

## II.

¶72 Even assuming that section 6.11(4) does apply to RMEI's claims, I disagree with the majority that references to other "investors" or "partners" in assignment clauses in the RMEI/Lario transaction agreements were sufficient, as a matter of law, to disclose to RMEI that Lario was acting as an agent (and thus, that Tracker was merely an "unidentified," rather than an "undisclosed," principal for purposes of section 6.11(4)). Maj. op. ¶¶ 37–46.

¶73 Several comments to related provisions of the Restatement emphasize that whether a third party has received sufficient notice of the existence or identity of a principal is a question of fact. See Restatement (Third) of Agency § 6.01 cmt. c ("Whether the existence and identity of any principal have been disclosed are questions

---

[2] RMEI's civil conspiracy claim, which is actually based on fraudulent concealment, does not turn on whether Tracker was "unidentified" or "undisclosed." An unscrupulous agent can fraudulently conceal a principal's existence or mislead the third party as to the principal's true identity. Contrary to what the majority derives from section 6.11(4) of the Restatement, the third party is not precluded from claiming fraud in the latter case simply because the principal was disclosed but unidentified.

of fact."); id. § 6.02 cmt. d ("It is a question of fact whether a third party has such notice [of a principal's identity]."); id. § 6.01 cmt. c ("It is a question of fact whether facts known by a third party gave the third party reason to know that person with whom it dealt acted as agent on behalf of a disclosed principal."); id. § 6.03 cmt. c ("It is a question of fact whether the third party has received sufficient notice that the contract is made with an agent who represents a principal and sufficient notice of that principal's identity."); cf. Water, Waste & Land, Inc. v. Lanham, 955 P.2d 997, 1002 (Colo. 1998) ("Whether a principal is partially or completely disclosed is a question of fact.").

¶74    Importantly, a third party such as RMEI has no burden to inquire about the existence of a principal. See Restatement (Third) of Agency § 6.01 cmt. c ("The third party with whom an agent deals does not have a burden of inquiry [regarding the existence and identity of any principal]."). Put differently, a principal's existence is not considered "disclosed" simply because "a third party could conceivably have discovered that the agent acted as the principal's representative." Id. Moreover, where an agent's manifestations as to the principal's existence or identity are ambiguous, the third party's reasonable belief about the existence (or not) of a principal is conclusive. Id. § 1.04 cmt. b ("If manifestations [by a principal or agent] as to the principal's existence or identity are ambiguous, the third party's belief is conclusive if it is reasonable.").

¶75    In my view, references in the transaction agreements regarding the possible future assignment of interests to "investors" or "partners" were, at best, ambiguous regarding the existence of an agency relationship. And under the circumstances, RMEI

4

reasonably believed that Lario was <u>not</u> acting as an agent. Pursuant to comment b of section 1.04 of the Restatement, RMEI's reasonable belief should be conclusive. <u>Id.</u> At the very least, whether RMEI had notice is a disputed question of fact for a jury.

¶76 The majority concludes that, as a matter of law, references to "investors," "partners," and "third parties" in assignment clauses in the Lario Letter of Intent and the Lario Purchase and Sale Agreement provided notice to RMEI that Lario was acting on behalf of an unidentified principal (Tracker). Maj. op. ¶¶ 37–46. The Lario Letter of Intent provided, in relevant part, that Lario "has other investors or partners who may elect to join in the acquisition of the Properties under the terms of this Letter Agreement" and that "Lario shall have the right to assign a portion but not all of its interest in this Letter Agreement to such investors or partners." The Lario Purchase and Sale agreement includes an assignment clause, which provides that Lario "shall have the right to assign a portion but not all of its interest in this Agreement to third parties who have agreed to participate in this transaction."

¶77 I disagree that these provisions were sufficient, as a matter of law, to put RMEI on notice that Lario was acting as an agent. The terms "investors," "partners," and references to potential future assignment of interests do not unequivocally disclose an <u>agency relationship</u> with such parties. At best, such terms are ambiguous as to such a relationship.

¶78 Moreover, the circumstances of this case led RMEI to reasonably believe that Lario was not acting as an agent, and that DG&S was involved in the transaction as counsel for Lario alone—not for an unidentified principal (and certainly not for

5

Tracker). Lario requested RMEI's permission to use DG&S as its attorney on the deal, id. at ¶ 16, and Lario later referred to DG&S as its counsel in various communications with RMEI, id. at ¶ 19. In addition, DG&S drafted many of the pertinent transaction documents, communicated with RMEI's bank, facilitated the creation of an escrow account, and scrubbed metadata from anything coming from Tracker to prevent RMEI from learning of Tracker's involvement. Id. at ¶ 18. RMEI thus reasonably believed DG&S represented Lario in the deal; no one informed RMEI that DG&S had determined it could not represent Lario because of its ongoing relationship with Tracker, or otherwise corrected RMEI's misimpression that DG&S represented Lario. Given the ambiguity of the references to "investors" and "partners" in the transaction documents, under comment b of section 1.04 of the Restatement, RMEI's reasonable belief that no agency relationship existed should be conclusive. At a minimum, whether RMEI had notice of the existence of a principal is a disputed question of fact for which summary judgment was inappropriate here. See Restatement (Third) of Agency §§ 6.01 cmt. c, 6.02 cmt. d, 6.03 cmt. c.

## III.

The majority reasons, in the alternative, that if section 6.11(4) of the Restatement does apply because Tracker was an unidentified principal for Lario, the record nevertheless does not support RMEI's assertion that Lario falsely represented to RMEI that Lario was not acting on behalf of a principal. Maj. op. ¶ 47. In so doing, the majority alters the longstanding test for what constitutes a "false representation" by requiring that the means used to deceive be of a "definite and specific character." Id.

6

at ¶ 48. The majority then applies this "definite and specific character" requirement both in its analysis under section 6.11(4) and in its analysis of RMEI's claim for fraudulent misrepresentation against DG&S. See id. at ¶¶ 48–50, 55.

¶80 The majority's new "definite and specific character" requirement for a false representation is drawn from a single line in H.B. Bolas Enterprises, Inc. v. Zarlengo, 400 P.2d 447, 450 (Colo. 1965). Our decision in H.B. Bolas offered no analysis of this phrase because that case ultimately did not turn on whether the means used to deceive were sufficiently "definite and specific." In that case, no false representation was made at all. Id. Since that decision issued, H.B. Bolas has not been cited for the proposition for which the majority relies on it today, nor has any court deemed that language a dispositive factor in determining whether a party made a false representation. In my view, whether words and conduct are sufficiently "definite and specific" may, at most, bear on whether a party reasonably relied on them for purposes of establishing the "reasonable reliance" element of a fraud claim. See maj. op. ¶ 53 (setting forth elements of claim for fraud by affirmative misrepresentation); see also id. at ¶ 48 (noting that a party has "no right to rely on circumstances, conduct, or words that are equivocal" (quoting H.B. Bolas, 400 P.2d at 450)). But I disagree that "words and conduct" that are not "sufficiently definite or specific" cannot, as a matter of law, "constitute a false representation." Maj. op. ¶ 50 (emphasis added); see also id. at ¶ 55 (concluding that DG&S's conduct was not "definite and specific" enough to constitute an affirmative misrepresentation that Lario was acting alone, and consequently, any reliance by RMEI was unjustified). The test for what constitutes a "false representation" is simply

7

whether a party engaged in words or conduct (or a combination thereof) that created an untrue or misleading impression. See CJI-Civ. 4th 19:3; see also Nelson v. Gas Research Inst., 121 P.3d 340, 343 (Colo. App. 2005). And generally, whether there has been a misrepresentation and whether a party has a right to rely on the representations are both "question[s] of fact to be determined by the trier of fact upon the circumstances of each individual case." Bassford v. Cook, 380 P.2d 907, 910 (Colo. 1963); Zimmerman v. DanKamphausen Co., 971 P.2d 236, 240 (Colo. App. 1998); see also Nelson v. Elway, 908 P.2d 102, 123 (Colo. 1995) (recognizing that "reasonable reliance is a question of fact"). Here, DG&S (1) drafted the Lario Purchase and Sale Agreement and other documents in the transaction; (2) worked with the escrow agent; (3) hosted the closing at its offices and prepared the final closing documents; and (4) failed to correct Lario's references to DG&S as its counsel. In my view, these allegations amount to "words or conduct" that "created an untrue or misleading impression" that DG&S was acting solely on Lario's behalf and that Lario was acting alone. And because RMEI produced evidence that it relied on DG&S's conduct, it is for a jury to determine whether such reliance was justifiable. Cf. Westin Operator, LLC v. Groh, 2015 CO 25, ¶ 21, 347 P.3d 606, 611 ("Summary judgment is a drastic remedy, to be granted only when there is a clear showing that the controlling standards have been met. Even where it is extremely doubtful that a genuine issue of material fact exists, summary judgment is inappropriate." (internal quotation marks omitted)).

**IV.**

8

¶81 Finally, I disagree with the majority's resolution of RMEI's claim that DG&S aided and abetted a breach of fiduciary duty owed by Tracker to RMEI. Maj. op. ¶¶ 58–66.

¶82 RMEI argues that the 2006 Purchase Agreement and the 2008 Participation Agreement between Tracker and RMEI established a joint venture. During discovery, RMEI produced an expert report that stated "AMI [Area Of Mutual Interest] agreements in the oil and gas industry"—like those contained in the 2006 and 2008 agreements—"are common and are understood to create a joint venture/partnership relationship." RMEI also produced evidence that the 2006 Purchase Agreement and the 2008 Participation Agreement "separately and collectively" established a joint venture.

¶83 The majority holds that an intervening agreement, a model form operating agreement signed by Tracker and RMEI in 2007, "expressly disclaims any fiduciary relationship that otherwise may have existed between Tracker and RMEI." Id. at ¶ 64. I disagree. The 2007 Tracker Operating Agreement provides:

> It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership, joint venture, agency relationship or association, or to render the parties liable as partners, co-venturers, or principals. In their relations with each other under this agreement, the parties shall not be considered fiduciaries . . . .

(Emphases added).

¶84 In my view, this provision clarifies that "this agreement," i.e., the 2007 Tracker Operating Agreement, does not create a joint venture or fiduciary relationship. I do not understand it to dissolve any joint venture created by the 2006 Purchase Agreement. Indeed, when Tracker's vice president of land was asked during a deposition about this

9

disclaimer, he testified: "I believe 'the agreement' is referring to this agreement, which is the operating agreement."

¶85 Additionally, RMEI produced an expert report stating that joint operating agreements like the 2007 Tracker Operating Agreement "are typically separate and distinct from other contracts and agreements such as AMI Agreements." The expert report also explains that "[b]y its very nature and terms, the AMI Agreement [within the 2006 Purchase Agreement] has precedence over the [2007 Operating Agreement] in regards to the broader, overarching business relationship, most particularly concerning . . . the avoidance of self dealing and competing interests." In short, the 2007 Operating Agreement did not modify or disclaim any joint venture established by the 2006 Purchase Agreement. Rather, the 2007 Operating Agreement is limited, by its own terms, to well-drilling operations, and does not waive the parties' fiduciary duties under the separate AMI provisions that controlled the parties' purchases, sales, and trades of oil and gas leases within the AMI. This conclusion tracks the language of the 2007 Operating Agreement, which provides that, "to the extent the provisions of this Joint Operating Agreement and the AMI Agreement are inconsistent with the [2006 Purchase Agreement], the provisions of [the 2006 Purchase Agreement] shall govern and control."

¶86 Even if the 2007 Operating Agreement disavowed any joint venture or fiduciary relationship "that otherwise may have existed between Tracker and RMEI," maj. op. ¶ 64, it did not preclude the parties from forming a joint venture in the future. RMEI argues—and produced evidence that—the 2008 Participation Agreement

10

established a joint venture independent of the 2006 and 2007 agreements. Consequently, whether Tracker owed RMEI a fiduciary duty is a disputed question of material fact and should not be decided on summary judgment. See A.B. Hirschfeld Press, Inc. v. Weston Grp., Inc., 824 P.2d 44, 46 (Colo. App. 1991) (recognizing that "whether a joint venture exists is a question of fact"), aff'd, 845 P.2d 1162 (Colo. 1993).

**V.**

¶87    In sum, because I do not believe that section 6.11(4) of the Restatement (Third) of Agency has any bearing on the claims at issue in this case; because I disagree with the majority's conclusion that the assignment clauses in the transaction agreements were sufficient, as a matter of law, to disclose to RMEI that Lario was acting as an agent; because I disagree with the majority's new "definite and specific character" requirement for false representations; because I believe the majority misreads the 2007 Operating Agreement; and because I believe disputed issues of material fact exist in this case that render summary judgment unwarranted, I respectfully dissent.

I am authorized to state that JUSTICE COATS joins in this dissent.